STATE of Missouri, Respondent,

v.

Charles BEAL, Appellant.

No. 55315.

Supreme Court of Missouri,
En Banc.

June 14, 1971.

As Modified on Court's Own Motion
Sept. 13, 1971.

Rehearing Denied Sept. 13, 1971.

John C. Danforth, Atty. Gen., James M. Reed, Asst. Atty. Gen., Jefferson City, for respondent.

J. Arnot Hill, Kansas City, for appellant.

FINCH, Acting Chief Justice.

Defendant, along with other persons, was charged with murder in the first degree. Tried separately, he was found guilty by the jury which assessed his punishment at death. The case was tried by the state on the basis of the so-called felony-murder doctrine under § 559.010, V.A.M.S., which provides that every homicide committed in the perpetration of certain offenses, including robbery, shall be murder in the first degree. We affirm.

Various alleged trial errors are asserted by defendant on appeal, but the principal questions presented for decision are these: (1) Was the indictment sufficient to charge defendant under the felony-murder doctrine and does that doctrine apply when persons who have just committed a robbery are fleeing from the police and their getaway car strikes another automobile resulting in death of an occupant thereof? (2) When the prosecutor, before trial, offers to reduce the charge from first degree to second degree murder (a non-capital offense) if defendant pleads guilty, is it a violation of defendant's Fifth and Sixth Amendment rights thereafter to require defendant to risk the death penalty on a first degree murder charge in order to avail himself of the opportunity to plead

not guilty and to seek by trial to establish his innocence? (3) Is due process violated by a jury trial in which, without specific standards for assessing punishment, the jury determines both guilt and punishment in a single trial?

The state's evidence was that at about 3:15 p. m. on February 15, 1969, Officer Byrd, while stopped at an intersection in a police vehicle, saw four men, at least three carrying hand guns, run out of a grocery store. The four had just robbed the store of money from the cash register. Some shots were fired in the process. One of the four (defendant herein) ran to a car parked near the store, climbed into the driver's seat and started the car. The other three started running away but one (Connie Jasper) then ran to the passenger side of the moving car and climbed in. The car then sped down 35th Street at high speed (50–70 m. p. h.). Byrd reached for his shotgun and fired at the fleeing car, knocking out the rear window. He then pursued the car, keeping it in sight except for a brief period (estimated at two to three seconds) when it went over the crest of a small hill. As Byrd's vehicle crossed over this hill he saw that the escape car, at the intersection of 35th Street with Van Brunt, had run into the passenger side of a station wagon, knocking two people out on the ground. One of those persons, Ward Wooderson, was killed as a result of the collision. Defendant and Connie Jasper got out of the escape car and were taken into custody by the police. Officer Byrd estimated the elapsed time between the start of the getaway car and the collision at twenty seconds.

### FELONY-MURDER DOCTRINE QUESTIONS.

 Initially, defendant contends that the indictment was insufficient to permit submission of this case under the felony-murder doctrine because it made no reference to a robbery and did not state that the homicide was committed during perpetration of a robbery. However, it is well

settled in this state that a prosecution for first degree murder which occurs in the perpetration of a felony enumerated in § 559.010 may be maintained on the basis of an indictment or information which charges a wilful, deliberate and premeditated killing, without referring to the fact that the homicide occurred during perpetration of a felony mentioned in the so-called felony-murder statute. State v. King, 342 Mo. 1067, 119 S.W.2d 322; State v. Smith, Mo., 310 S.W.2d 845, cert. den. 358 U.S. 910, 79 S.Ct. 237, 3 L.Ed.2d 231. We affirm that rule. The state should not be required to recite in its indictment the proof that it will offer to establish deliberation and premeditation or the fact that such proof will be supplied by showing that the homicide occurred in the perpetration of a robbery. The indictment was sufficient to advise the defendant of the nature and cause of the accusation against him, as required by the Sixth Amendment to the Constitution of the United States. It informed him that, along with certain others, he was charged with unlawfully, wilfully, feloniously, premeditatedly, deliberately and with malice aforethought driving his automobile into another automobile occupied by Ward Wooderson, inflicting a mortal wound on him. Those allegations were sufficient to put him on notice that he was charged with first degree murder and to inform him as to the means by which the homicide was alleged to have been produced. We have examined the cases cited on this point by defendant but in our judgment they do not dictate a result different than we reach.

■ Next, defendant asserts that a verdict should have been directed because under the state's own evidence the homicide was not incident to the robbery. He argues that this is true because the robbery had been completed at the time of the automobile collision and the pursuing officer had lost sight of defendant and the car in which he was fleeing the scene. Our decided cases hold otherwise. In State v. Adams, 339 Mo. 926, 932, 98 S.W.2d 632, 636, involving the shooting of a town marshal following a burglary, the court said: " * * * it has been held where the initial crime committed was robbery, that the asportation of the property seized, being an essential element of the crime, protracts it so long as the robbers are attempting to carry away and complete their dominion over the property; and hence that a killing by the robbers during their flight from the scene of the crime with the plunder is a homicide committed in the perpetration of the robbery." See also State v. Messino, 325 Mo. 743, 764, 30 S.W.2d 750, 759; State v. Engberg, Mo., 376 S.W.2d 150, 155; Annotation 22 A.L.R. 850, supplemented by 108 A.L.R. 847.

■ Defendant next argues that application of the felony-murder doctrine to this factual situation is not authorized by previously decided Missouri cases. His brief states that, "In all the cases that we have read regarding homicides that occurred during an escape from a robbery, the courts have proceeded on the theory that the defendants agreed among themselves to rob and thereafter to escape by force of arms." Defendant then claims that the reasoning in those cases would not apply to or encompass a homicide caused by a collision between the escape car and another vehicle. He argues that at most this would amount to manslaughter by culpable negligence and not first degree murder under the felony-murder doctrine.

Other states have considered this question. In Whitman v. People, 161 Colo. 110, 420 P.2d 416, defendant and another person conspired to rob a creamery. During the robbery, defendant waited in a nearby automobile. As defendant's co-conspirator was leaving the creamery, two Denver police officers, purely by chance, stopped their squad car directly in front of this establishment. Adamson, the co-conspirator, proceeded swiftly to the waiting car, entered and defendant drove off. The officers, upon notification by the victim of the robbery, pursued. The chase was a high speed one with the cars moving as fast

as 100 miles per hour. Ultimately, defendant collided with another vehicle, fatally injuring the driver. Defendant was tried and convicted under the Colorado felony-murder statute which provided that murder committed in the perpetration or attempt to perpetrate a robbery would be murder in the first degree. In affirming that conviction the Colorado Supreme Court said, 420 P.2d 1. c. 418: "Colorado would appear to be in accord with the general rule that the turpitude of the felonious act, in this case robbery, supplies the element of deliberation and design to effect death, and that therefore no express or implied design to effect death is essential and the murder is still of first degree though 'casual and unintentional.' "

In People v. Ulsh, 211 Cal.App.2d 258, 27 Cal.Rptr. 408, defendants robbed a liquor store and then attempted to escape in an automobile. Police, notified by a silent alarm system, spotted the defendants leaving the scene of the robbery and followed in hot pursuit. During the chase, many shots were fired. The chase ended when defendants' automobile collided with another car at an intersection 3.2 miles from the scene of the liquor store, killing a passenger in that vehicle. At the trial defendants moved to dismiss on the ground that when they left the liquor store the robbery in and of itself was completed and that the felony-murder doctrine would not apply. In addition to holding that the lapse of time and the distance traveled did not terminate the criminal activity in perpetration of the robbery, the court held that the collision was the direct consequence of the effort to escape, and then said, 1. c. 417: "It is clear that it is of not the slightest consequence that the robbers here did not intend to bring about the victim's death. * * * It was a killing in the perpetration of a robbery, and is therefore murder in the first degree regardless of whether it was intentional or accidental."

We conclude, as did the courts in Whitman and Ulsh, supra, that the homicide resulting from the collision which occurred in an attempt to escape falls within the legislative enactment contained in § 559.-010, and that the trial court did not err in submitting the case under the felony-murder doctrine.[1]

Incidental to the issue involving application of the felony-murder doctrine, defendant complains of the giving of Instruction No. 3 (submitting the case pursuant to the felony-murder doctrine) on the basis that the robbery had ceased and that the homicide was not a part of the agreement that the state sought to establish. We have ruled on these issues in connection with defendant's contention that a submissible case was not made, and for the same reasons overrule this assignment.

## EFFECT OF OFFER BY PROSECUTOR TO REDUCE CHARGE IN EVENT OF PLEA OF GUILTY.

■ In his motion for new trial defendant alleged that in the week prior to trial the prosecuting attorney advised counsel for defendant that he would reduce the charge to murder in the second degree and recommend a sentence of a term of years if defendant would plead guilty. He further alleges that, although advised by his attorney to so plead, defendant insisted on standing trial. Relying on Pope v. United States, 392 U.S. 651, 88 S.Ct. 2145, 20 L.Ed.2d 1317, and United States v. Jackson, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138, defendant contends that it was a violation of his Fifth and Sixth Constitutional Amendment rights to require him, under such circumstances, to risk the death penalty in order to exercise his constitutional right to plead not guilty and submit the question of his guilt or innocence to a jury.

---

1. In this connection, see also annotation "Homicide by Automobile as Murder," 21 A.L.R.3d 116, 133; 40 C.J.S. Homicide § 21, p. 868; 40 Am.Jur.2d, Homicide, § 73, p. 366; 15 Blashfield, Automobile Law and Practice, § 490.74, p. 388.

When the motion for new trial was heard, the prosecuting attorney and the attorney for the defendant both testified as to their conversations as to possible disposition of this case on a plea of guilty. There was some divergence of recollection as to whether the prosecuting attorney offered to reduce the charge for a plea of guilty or whether he responded to a question by counsel for defendant as to what he would recommend if defendant would plead guilty to second degree murder. These differences are not of consequence here because in any event they show that although plea negotiations between counsel did occur, they led to nothing because defendant insisted on standing trial.

The cases of Pope and Jackson are not applicable to this situation. In those cases the statute provided that in the event of a verdict of guilty the death penalty could be assessed, but no provision for the death penalty was made where the defendant pleaded guilty. Thus, the statute, by its terms, provided that if an individual chose to exercise his right to stand trial, he ran the risk of being sentenced to death, whereas if he pleaded guilty to the same charge, the most he could get was life imprisonment. The court in both cases held that the portion of the law imposing the death penalty was unconstitutional because it imposed a statutorily mandated price for standing trial instead of pleading guilty. The cases do not purport to have any application to plea negotiations in a case where the maximum potential punishment is the same regardless of whether the case is disposed of by trial or by plea of guilty.

Defendant's brief expressly states that he does not attack the constitutionality of the statute involved in this case. He recognizes that under the Missouri statute a defendant in a felony-murder case could be sentenced to death in a case tried before a jury or in a jury-waived case or on a plea of guilty. His brief says, "It is not the law that we attack in this argument—it is the situation created by a prosecuting attorney's offer to reduce a charge from first degree murder, a capital charge, to second degree murder if a defendant will enter a plea of guilty." His position is clarified further when he states in his brief, "When the prosecuting attorney offered to reduce the charge against the defendant in the case at bar to murder in the second degree, a non-capital offense, if he would enter a plea of guilty, he as a public official had announced that the ends of justice would have been served if there was a conviction and sentence for a period of years or for life, but that if defendant insisted on his right to have a jury trial, then he should pay the penalty of death if the prosecuting attorney could secure such a verdict from the jury."

Defendant would bind the state in the event of trial to the reduced charge to which the prosecuting attorney was willing that the accused should plead if he entered a plea of guilty. His position is that thereafter to impose any greater penalty on the defendant than the prosecuting attorney would have recommended amounts to a penalty imposed on defendant for exercising his privilege of pleading not guilty and standing trial. We do not agree. Properly safeguarded, plea negotiations are proper and have been approved. For example, in Meyer v. United States, 8th Cir., 424 F.2d 1181, 1188, the court, quoting from Brown v. Beto, 5th Cir., 377 F.2d 950, 956, said: "Properly safeguarded plea discussions and plea agreements between an accused and a *prosecutor* are consistent with the fair administration of justice. They are a 'pervasive practice. The great majority of criminal cases are disposed of by pleas of guilty, and a substantial number of these pleas are the result of prior dealings between the prosecutor and the defendant or his attorney.'"

■ In the recently published "Standards Relating To Pleas Of Guilty," a pamphlet written by the American Bar Association Project on Minimum Standards for Criminal Justice, the American Bar Association expressly approves plea

discussions and plea agreements. In Part III, § 3.4 thereof, the standards recite that plea discussions with the prosecuting attorney and any plea agreements reached are not admissible in evidence for or against a defendant unless he subsequently enters a plea of guilty or nolo contendere which is not withdrawn. We approve of that rule. Otherwise, a defendant, merely by engaging in nonproductive plea negotiations, could effectively reduce the charge which he would be required to defend. The result would be to discourage or perhaps prevent plea discussions and attempts to agree (by concession in the charge to which the plea is to be entered or by agreement on a recommendation as to punishment) on disposition of criminal cases. We overrule this contention.

## WAS DUE PROCESS VIOLATED BY ASSESSMENT OF DEATH PENALTY IN A ONE-STEP TRIAL IN WHICH INSTRUCTIONS DID NOT PROVIDE SPECIFIC STANDARDS FOR ITS ASSESSMENT?

■ These questions are raised by defendant but they have been settled in the cases of Crampton v. Ohio, No. 204, 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711, and McGautha v. California, No. 203, 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711, both decided on May 3, 1971. On the authority of those cases, we decide these issues against defendant.

## OTHER ISSUES RAISED BY DEFENDANT'S APPEAL.

■ Defendant's next contention is that the trial court erred in not declaring a mistrial as the result of an incident involving removal of handcuffs from the defendant. The transcript shows the following colloquy outside the hearing of the jury:

"MR. HILL: If it please the Court, as the jury was coming into the box the Deputy Sheriff—the defendant was standing in the courtroom in handcuffs and the Deputy Sheriff was in the act of taking his handcuffs off. I would just like for this to be a matter of record; it may be something we can correct later, by explaining to the jury that the defendant is a prisoner, and that all prisoners are brought to and from—in other words, to and from the jail, in handcuffs. In other words, I don't want the jury to draw an inference that the defendant is a dangerous man.

"MR. FREEMAN: Well, Your Honor, now the handcuffs were actually removed out in the hallway.

"MR. HILL: No, they were not; they were removed in the front part of the courtroom.

"MR. FREEMAN: Well, excuse me then; I apparently did not see what happened, because I just passed the Deputy in the hallway and he was taking the handcuffs off.

"MR. HILL: Well, the Deputy did not succeed in getting the handcuffs off of him because he couldn't locate his keys, he was fumbling—

"MR. FREEMAN: Well—

"MR. HILL: I asked him to take the defendant into the hall so that the rest of the jury would not see it.

"THE COURT: I don't know any way to correct it. Would you think that that is error—if you think that that is error, reversible error, why I think you will just have to make your record on it. It seems we can't try a lawsuit, a criminal lawsuit, without something of this kind, which is wholly unintentional; the man is a prisoner, he is charged with Murder First Degree, and if the fact that he has got handcuffs on him is reversible error, then I give up. Now if the appellate court wants to reverse a case on that ground, it is

their responsibility. Now I am sure you are doing what you think you ought to do, and that is all right, but I want to tell you now that I am not going to make any speech to the jury about it.

"MR. HILL: At this time, Your Honor, by reason of the fact that the defendant was brought into the courtroom in shackles as a prisoner in front of some of the jurors, we move at this time for a mistrial and ask that the jury be discharged.

"THE COURT: Your motion is respectfully overruled."

We have recognized that granting a mistrial is a drastic remedy, to be utilized only when there is grievous error which cannot be remedied otherwise. The trial court observes first hand what occurs and has considerable discretion in deciding whether a mistrial is warranted. Only if an appellate court finds such discretion to have been abused should a case be reversed for failure to declare a mistrial. State v. Camper, Mo., 391 S.W.2d 926. We cannot so find here. The transcript indicates that the incident was inadvertent. It occurred while the jury was entering the jury box and it is not at all certain that they even saw the occurrence. There is no testimony to show that they did. We will not speculate as to whether they did. Proof thereof is required. State v. Caffey, Mo., 404 S.W.2d 171. Factually, this case is quite different from State v. Rice, 347 Mo. 812, 149 S.W.2d 347, on which defendant primarily relies. We find nothing in the record presented to indicate that the officer exceeded his right to take reasonable precaution for retention of custody of defendant. State v. Edmonson, Mo., 371 S.W.2d 273; State v. Temple, 194 Mo. 237, 92 S.W. 869.

■ A further complaint by defendant is that the court refused to permit his mother to testify that he suffered from a speech impediment, his theory being that he had spoken indistinctly while testifying and he was entitled to have this explanation presented to the jury. In attempting to so show, defendant's counsel asked defendant's mother this question: "Q. We have had difficulty in understanding Charles when he spoke on the stand; can you tell us whether he has ever had any serious impediment in his speech?" The prosecuting attorney immediately started to object, but before his objection was completed the witness answered the question by saying, "Yes sir." Thereafter, there was some discussion outside the presence of the jury, after which the court sustained the prosecuting attorney's objection, but the answer of the witness stating that the defendant did have a serious impediment in his speech was not ordered stricken and the jury was not instructed to disregard it. Hence, the jury had before it the mother's testimony that the defendant did have a serious speech impediment. That is what counsel says he was entitled to show. We overrule this point.

■ Next, defendant complains that a comment by the trial court to the jury at the close of the first day of trial indicated that the court believed the defendant guilty and that his character was such that he would make false claims. The incident occurred when the jury was being taken to the jury room at the close of the day's testimony, and was as follows:

"MR. FREEMAN: Your Honor, I believe they should be advised—I assume they are not to read any newspaper accounts—

"THE COURT: Yes, you are not to read any newspaper accounts. I don't think there will be any newspaper accounts. But, Mr. O'Brien, before you let them see a newspaper be sure that there is nothing in the paper about this trial.

"BAILIFF WILLIAM J. O'BRIEN: Yes. And they can't accept phone calls over there?

"THE COURT: No, you can't accept phone calls over at the Hotel. You have to make your calls here, because it is confusion over there to call out, and there is always a suspicion that somebody, if you get a call, is talking about this case. So there won't be any incoming or outgoing calls after you leave here. I am sorry to have to be that, you might say rough about it, but that is the only way we can be sure that the defendant doesn't complain that somebody did talk to you. We have to guard against all those things, Gentlemen, just to be very careful that none of the rights, none of the rights of defendant are in any way affected."

We find nothing wrong with the court's direction, and do not consider that it indicated a belief of defendant's guilt or that defendant would make false claims. The contention is without merit.

 Finally, defendant claims that he was denied due process of law as guaranteed by the Fifth Amendment to the Constitution of the United States in that his conviction allegedly was based in part on perjured testimony, the use of which he claims the state unfairly failed to disclose. He bases this contention on the following occurrences. In the state's case one of the owners of the grocery testified that during the robbery the bills which were in the cash register were taken plus a roll of dimes wrapped in a regular wrapper obtained for that purpose from the bank. Officer Byrd then testified that at the time of the arrest of defendant Beal he found on him thirty-eight dollars in currency plus a roll of dimes in a green wrapper. Officer Fundom testified that he found no cash on defendant but that Officer Byrd did recover some cash. On cross-examination counsel for defendant again asked what money was found on defendant but did not ask Byrd whether in fact the money was found on Connie Jasper. However, in the defendant's case counsel called the court reporter who had taken the testimony in a prior trial of Connie Jasper arising out of this same incident, and had the reporter read from the testimony of Officer Byrd as given in the trial of Connie Jasper. In that testimony Officer Byrd testified that he found on the person of Connie Jasper one twenty-dollar bill, one ten-dollar bill, one five-dollar bill and three one-dollar bills and that Officer Fundom took a roll of dimes from Connie Jasper.

Defendant cites and relies upon Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791, Alcorta v. Texas, 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9, and Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed. 2d 1217. The three cited cases involved situations in which perjured testimony (important to the state's case and known by the state to be false) was used without the defendant, his counsel or the jury knowing or being so informed. The cases recognize that had these facts been called to the attention of the jury, the result might well have been different. The use of such testimony with the resulting deception of the court and jury was held to violate due process.

However, in our view, the cases cited are not authority for granting a new trial to defendant in this case. Here it is clear from the transcript that the divergence in Byrd's testimony as to whether the bills and dimes were found on defendant or on Connie Jasper was brought to the attention of the jury. Counsel for defendant had the exact testimony from the Jasper trial read to the jury and it thus knew what Officer Byrd had said on both occasions. Furthermore, during the argument of the case, Mr. Hill, attorney for defendant herein, argued at considerable length with reference to this inconsistency in the testimony of Officer Byrd. He said that Byrd had testified in the Connie Jasper trial that the $38.00 and the roll of dimes were taken from Connie Jasper, but in this trial he testified that the $38.00 and the roll of dimes were taken from defendant Beal. He commented adversely on Officer Byrd and this inconsistency in his statement, for example, say-

ing the following: "Now, the only evidence that this man came out of the building is Officer Byrd's testimony. If his testimony that he saw him get in the car—that this man was outside the car, came out of the store and got in that car—if Officer Byrd's testimony as to that was no more accurate than his testimony as to the thirty-eight dollars and the roll of dimes, why then it doesn't amount to any evidence whatsoever."

In response, counsel for the state argued that there appeared to be little doubt that Officer Byrd had been confused when he testified in this case or when he testified in the Connie Jasper trial about where the $38.00 in currency and the roll of dimes came from, but pointed out that it made little difference, actually, because the evidence disclosed that the four men came out of the store and one of them, the defendant, was seen to go to the car and get into the driver's seat and drive off, with Connie Jasper then climbing in while the car was moving, and that a few seconds later the car was involved in a collision and that Connie Jasper and the defendant then alighted from the car, getting out from the passenger and driver's positions, respectively.

The inconsistency having been called to the attention of the jury, it was for them to decide whether Officer Byrd was simply confused in his recollection or whether he was deliberately lying about where the money was found. The defendant is not entitled to a reversal on the basis of lack of due process on the ground that perjured testimony was used and that its use was concealed from the defendant, his counsel and the jury.

Judgment affirmed.

DONNELLY, SEILER, MORGAN, HOLMAN and BARDGETT, JJ., and WOLFE, Special Judge, concur.

HENLEY, C. J., not sitting when cause was submitted.