STATE OF NORTH CAROLINA v. SAMUEL McCOTTER

No. 56

(Filed 27 August 1975)

**1. Criminal Law § 22— arraignment defined**

In criminal practice arraignment is the formal act of calling a defendant by name to the bar of the court, informing him of the offense with which he is charged, demanding of him whether he is guilty or not guilty, and entering his plea.

**2. Criminal Law § 22— failure of record to show arraignment**

Defendant is not entitled to a new trial because of the failure of the record to show a formal arraignment where the record shows that he was tried as if he had been arraigned and had entered a plea of not guilty. Statements to the contrary in *State v. Lueders*, 214 N.C. 558, and *State v. Cunningham*, 94 N.C. 824, are nullified.

3. **Criminal Law § 91— motion for continuance — appointment of additional attorney — solicitor's compliment to trial judge**

The trial court did not err in the denial of defendant's motion for a continuance for the appointment of an additional attorney where defendant stated that he was not dissatisfied with his court-appointed attorney but felt he needed more than one attorney; nor did the trial court err in the denial of the motion for continuance on the ground that, at the beginning of the term and in the presence of the jury, the solicitor stated that he had known the trial judge all his life and admired him as a person and a judge.

4. **Criminal Law § 34— testimony showing another crime — circumstances of incriminating statements**

In a prosecution for conspiracy to commit murder, the trial court did not err in permitting a witness to testify that he and defendant escaped from jail where the purpose of the testimony was not to show that defendant had committed the crime of escape but to explain the circumstances under which defendant made incriminatory statements relating to the conspiracy charge to which the witness testified.

5. **Criminal Law § 89— noncorroborative hearsay — harmless error**

In a prosecution for conspiracy to commit murder, defendant was not prejudiced by an officer's testimony as to one statement made to him by a witness which did not corroborate the testimony of the witness where the court immediately struck the testimony and instructed the jury to disregard it; furthermore, the admission of the stricken testimony was harmless beyond a reasonable doubt in view of the plenary competent, substantive evidence tending to establish the conspiracy charged.

Justice EXUM did not participate in the hearing or decision of this case.

APPEAL by the State pursuant to G.S. 7A-30(2) from the decision of the Court of Appeals, reported in 24 N.C. App. 76, 210 S.E. 2d 91 (1974), which reversed the judgment entered by *Exum, J.,* at the 25 February 1974 Session of the Superior Court of CRAVEN.

Defendant was convicted upon an indictment which charged that on 1 March 1973 he did "feloniously agree, plan, combine, conspire and confederate" with Jacqueline B. Graham to kill and murder Mary Patricia Elizabeth McGrath Waldo (Mrs. Waldo). The evidence for the State tended to show:

On the night of 21 April 1973, Mrs. Waldo visited a patient at the Craven County Hospital. Upon leaving she went to the parking lot and, as she attempted to start her automobile, she was shot in the head through the right front window. The shot shattered the glass and left seven or eight pellet holes in the

sun visor. Mrs. Waldo, bleeding very badly, got out of the car and slumped to the pavement. Someone came to her aid, and she was taken into the emergency room. Afer being x-rayed she was transferred to the Greenville Hospital. She testified that for about six weeks afterwards, "pieces of shot were pulled out of her head."

Vernie Swift (Swift), who worked at the Marine Naval Rework Facility (NARF) at Cherry Point, is a relative of defendant. She testified that she first met Mrs. Jacqueline B. Graham, a resident of Havelock, in February 1973 at a "Woman's Liberation meeting" over which Mrs. Waldo was presiding. After that meeting she continued to see and converse with Mrs. Graham. Once she helped Mrs. Graham clean house. One evening —"it could have been between March or April"—Mrs. Graham took Swift to New Bern and Swift introduced her to defendant. On two or three other occasions she was in the presence of both of these people. One time the three were together at or near a "rest area" four miles outside New Bern, where Mrs. Graham and defendant discussed "ways and means of getting rid of Mrs. Waldo. . . . There was a plan made that day."

Thereafter, from time to time, Swift delivered messages from Mrs. Graham to defendant—"messages like to tell Sammy [Samuel McCotter] to call her. It was urgent that he call her." Mrs. Graham gave Swift a picture of Mrs. Waldo which Swift delivered to defendant. She never carried any messages from defendant back to Mrs. Graham.

Once, after a "liberation meeting," Mrs. Graham met Swift in the lobby of NARF and gave her an envelope containing money, which Swift delivered to defendant. The money was counted in her presence and Swift saw $250.00. Later, in the ladies' restroom at NARF, Mrs. Graham gave Swift more money "in a ball, with a twenty-dollar bill on the outside." Swift also delivered this money to defendant.

After Mrs. Waldo was shot, Swift talked to Detective Sergeant Windham of the New Bern Police Department. He came to Cherry Point, and she told him everything she knew about this case.

Vance Banks, who was confined in the Craven County jail upon a charge of breaking and entering, was put in the same cell

with defendant. Except when quoted, Banks' testimony is summarized as follows:

During the night of May 16th Banks "overpowered Mr. Chamblee" (presumably the jailer) and took his gun away from him. Then Banks, defendant "and another man, whose first name is John," escaped. About 2:00 a.m. defendant and Banks went to the house of Bud Moses, a quarter of a mile from the jail. About 8:00 a.m. a young lady came in, and Sam had a conversation with her. After that, "he got another young lady by the name of Tanya." After a brief conversation with Tanya, he sent her to get a man by the name of Charles Lindsey, who (defendant said) was a "cold hearted young man." After four or five minutes, defendant told Banks that "this girl Jacqueline had hired him to shoot Mrs. Waldo . . . and he has asked Chuck Lindsey to do it"; that if "Jackie" had kept her mouth closed nobody would have found out about it. Banks had seen Officer Windham several times and had talked to him at least one time while he was in jail.

Detective Sergeant Windham investigated the shooting of Mrs. Waldo on the night of 21 April 1973 and, in the course of the investigation, he had a conversation with Swift at NARF at Cherry Point. At that time she made a statement to him with reference to "the incident at the Craven County Hospital" and "concerning Sam McCotter and Jacqueline Graham." Over defendant's objection Windham testified:

"Verna Swift told me that on a date in either late February or early March, she met with Mr. McCotter and Mrs. Graham in New Bern. They drove to a rest area about four miles outside of New Bern, and Mr. McCotter and Mrs. Graham discussed ways to kill Mrs. Waldo. That following that meeting, she carried some messages from Mrs. Graham to Mr. McCotter. That she did deliver some of the messages and some others she did not. That several weeks after the Highway 70 East meeting, Mrs. Swift delivered a sum of money from Mrs. Graham to Mr. McCotter. That after the next pay day she delivered a second sum of money. . . . That she delivered a photograph to Sam McCotter that Jacqueline Graham had given her. . . . She said it was a picture of Mary Patricia Waldo."

Before Judge Exum admitted the foregoing testimony, he instructed the jury that Swift's statement to Windham was not substantive evidence of the facts she had related to him; that

State v. McCotter

it was admitted solely for the purpose of corroborating the testimony Swift had given from the witness stand if the jury should find that it did corroborate her testimony.

Windham also testified that Swift stated to him that "one afternoon in March, Mrs. Waldo was to visit a home of a friend that had died and that Mrs. Graham and Mr. McCotter and herself went to Havelock and the purpose of this was for Mrs. Graham to point Mrs. Waldo out to Sam." Upon defendant's motion to strike this statement Judge Exum sustained the motion and instructed the jury "to strike" it from their minds and "not to consider it in any way in this case."

Windham's testimony further tended to show: Defendant was arrested on or about 2 May 1973. Thereafter, during the month of June 1973, he had a conversation with Vance Banks at the Craven County jail. At that time Banks stated to Windham that after he and defendant left the Craven County jail they went to "Moses' house"; that a young lady came into the house and defendant sent her for a second young lady named Tanya and then sent Tanya to get a man named Chuck; that Sam told Banks at that time, "This is a cold hearted young man that I just sent for; he is the gunman"; that defendant also told Vance "he was hired by Jacqueline Graham to kill Mrs. Waldo; that he in turn hired Charles Lindsey to do the shooting." This statement was admitted over defendant's objection, and after Judge Exum had given the jury the same limiting instruction which preceded the admission of Swift's statement to Windham. Windham's testimony concluded the State's case. Defendant's motion for judgment as in case of nonsuit was denied and defendant chose to introduce no evidence.

Upon the jury's verdict finding defendant "guilty as charged," the court adjudged that defendant be imprisoned for ten years in the State Prison. Upon appeal, the Court of Appeals reversed defendant's conviction and ordered a new trial upon the sole ground that the record failed to show the arraignment of defendant. One member of the panel having dissented, the State appealed to this Court as a matter of right.

*Rufus L. Edmisten, Attorney General, R. Bruce White, Jr., Deputy Attorney General, and Zoro J. Guice, Jr., Assistant Attorney General, for the State.*

*Michael P. Flanagan for defendant appellee.*

SHARP, Chief Justice.

[1]  In criminal practice *arraignment* is the formal act of calling a defendant by name to the bar of the court, informing him of the offense with which he is charged, demanding of him whether he is guilty or not guilty, and entering his plea. *See Crain v. United States,* 162 U.S. 625, 637-638, 16 S.Ct. 952, 956, 40 L.Ed. 1097, 1100 (1896); Ballentine's Law Dictionary (1948 Ed.); Black's Law Dictionary (Revised 4th Ed., 1968); 22 C.J.S., *Criminal Law* § 406 (1961).

In 1890, in *Crain v. United States, supra,* the Supreme Court reversed a felony conviction because the record failed to show that the accused was ever formally arraigned. Mr. Justice Harlan, speaking for six members of the Court, said: "[W]e think it may be stated to be the prevailing rule, in this country and in England, at least in cases of felony, that a plea to the indictment is necessary before the trial can be properly commenced, and that unless this fact appears affirmatively from the record the judgment cannot be sustained." *Id.* at 643, 16 S.Ct. at 958, 40 L.Ed. at 1102. Mr. Justice Peckham, with whom two members of the Court concurred, wrote a dissenting opinion which was to become the law twenty-four years later when the Supreme Court overruled *Crain v. United States* in *Garland v. Washington,* 232 U.S. 642, 34 S.Ct. 456, 58 L.Ed. 772 (1914).

In *Garland v. Washington,* speaking for a unanimous Court, Mr. Justice Day said with reference to *Crain v. United States:*

"Such rulings originated in that period of English history when the accused was entitled to few rights in the presentation of his defense, when he could not be represented by counsel, nor heard upon his own oath, and when the punishment of offenses, even of a trivial character, was of a severe and often of a shocking nature. Under that system the courts were disposed to require that the technical forms and methods of procedure should be fully complied with. But with improved methods of procedure and greater privileges to the accused, any reason for such strict adherence to the mere formalities of trial would seem to have passed away, and we think that the better opinion, when applied to a situation such as now confronts us, was expressed in the dissenting opinion of Mr. Justice Peckham, speaking for the minority of the court in the *Crain Case,* when he said:

" 'Here the defendant could not have been injured by an inadvertence of that nature. He ought to be held to have waived

that which under the circumstances would have been a wholly unimportant formality. A waiver ought to be conclusively implied where the parties had proceeded as if defendant had been duly arraigned, and a formal plea of not guilty had been interposed, and where there was no objection made on account of its absence until, as in this case, the record was brought to this court for review. It would be inconsistent with the due administration of justice to permit a defendant under such circumstances to lie by, say nothing as to such an objection, and then for the first time urge it in this court.' " *Id.* at 646, 34 S.Ct. at 457, 58 L.Ed. at 775.

The logic of the words of Mr. Justice Peckham is inescapable, and his words are applicable in toto to this case. Today the modern trend is that "[a]rraignment may be waived by pleading not guilty or by silence, at least in all except capital cases, if the accused is fully informed as to the charge and is not otherwise prejudiced in the trial of the case by the omission of that formality." 21 Am. Jur. 2d, *Criminal Law* § 457 (1965); 22 C.J.S., *Criminal Law* § 408 (1961).

The opinion of the Court of Appeals in this case made it quite clear that, in awarding defendant a new trial because of the record's failure to show his arraignment, it acted under the compulsion of this Court's decision in *State v. Lueders,* 214 N.C. 558, 200 S.E. 22 (1938).

In *Lueders* the defendant was tried upon a warrant which charged him with "practicing photography without a license and without being registered with the State Board of Photographic Examiners" in violation of Chapter 155, Public Laws of 1935. The "frankly avowed" purpose of Lueders' appeal was to test the constitutionality of the law under which the warrant was drawn. The case was originally tried in the Greensboro municipal court. The defendant was convicted and appealed to the Superior Court. There, upon an agreed statement of facts, the jury returned the following verdict: "Upon the foregoing statement of agreed facts, the jury for its verdict finds the defendant guilty."

To justify avoiding the constitutional question presented, this Court noted "certain irregularities" appearing on the face of the record: (1) "[T]he defendant entered no plea in the Superior Court, where, on appeal, the cause was to be tried de novo." (2) "[T]he verdict of the jury was rendered on an

agreed statement of facts, and the defendant excepts to the verdict. . . . There is no contention that the verdict is a special one." *Id.* at 560, 200 S.E. at 23.

With reference to the first irregularity the Court said: "In the absence of a plea to the indictment or charge, there was nothing for the jury to determine." *Id.* In support of this statement Chief Justice Stacy relied upon the rationale of Ashe, J., "speaking to a similar situation" in *State v. Cunningham,* 94 N.C. 824, 825 (1886), that where defendant filed no plea there was no issue to be submitted to the jury; that consequently the verdict returned was a nullity, and no judgment could be pronounced upon such a verdict.

In *Cunningham,* Justice Ashe also noted that the Superior Court had no jurisdiction of the simple assault with which defendant was charged because The Code gave exclusive original jurisdiction of offenses to Justices of the Peace during the six months following the assault.

Obviously, both the substantive and procedural facts of *Lueders* and *Cunningham* differ materially from those of this case. Further, as noted in the opinion of the Court of Appeals, the facts in each of the other cases cited in the *Lueders'* opinion are not comparable. *See State v. McCotter,* 24 N.C. App. 76, 77, 210 S.E. 2d 91, 92 (1974).

In this case there can be no doubt either that defendant was fully aware of the charge against him or that he was in nowise prejudiced by the omission of a formal arraignment—if indeed it was omitted. When the case was called for trial defendant's first motion was to quash the bill of indictment because "a charge of conspiracy violated his rights under the Constitutions." At the beginning of his charge Judge Exum read the bill of indictment to the jury and then said, "To this charge the defendant has entered a plea of not guilty." Neither defendant nor his counsel arose to deny that he had entered such a plea. Under all the circumstances the judge's recitals are entitled to full faith and credit.

[2]  From beginning to end, defendant's trial was a completely adversary proceeding. While the record is silent as to defendant's arraignment, it shows that he was tried as if he had been arraigned and had entered a plea of not guilty. In such case the absence of formal arraignment does not constitute reversible

error, and the statements in *State v. Lueders, supra,* and *State v. Cunningham, supra,* are nullified.

We hold that the Court of Appeals erred in ordering a new trial because of the failure of the record to show defendant's formal arraignment. Its decision, therefore, is reversed.

Because the Court of Appeals ordered a new trial upon a ground it held to be a threshold error, it considered only that one assignment. Ordinarily our review is restricted to the rulings of the Court of Appeals which are challenged in the petition for certiorari or on direct appeal and brought forward in appellant's brief filed in this Court. This case, however, is unusual in that it is a criminal case in which the State appeals to this Court. For that reason we elect to consider defendant's remaining assignments of error. *See State v. Muse,* 280 N.C. 31, 185 S.E. 2d 214 (1971). (With respect to appeals taken on or after July 1, 1975 which involve this situation, see North Carolina Rules of Appellate Procedure, Rule 16(a) (1975)).

[3] Defendant's second assignment is that the court erred in denying his motion "for a continuous for the appointment of additional counsel." In reply to the judge's inquiry, defendant said that he was not dissatisfied with his court-appointed attorney; he did not suggest his counsel was incompetent. He merely said he felt he needed more than one attorney. In view of the uncontradicted evidence of defendant's guilt of the crime charged, there is no reason to believe that additional attorneys could have been of assistance. Obviously, defendant's real need was for a witness.

As another ground for continuance, defendant argued that he had been prejudiced by the solicitor's statement, made at the beginning of the term and in the presence of the jury, that he had known Judge Exum all his life and admired him as a person and a judge. Defendant said he felt the compliment which the solicitor paid the judge "would tie the solicitor in closer to the judge," and that "they would give more credence to the State's witnesses." The judge then explained to defendant that "the District Solicitor is not trying the case; the assistant solicitor is trying the case." Defendant's reply to that was, "He is just as bad. Whatever they are doing when they do it, they are trying to do it to me."

Upon the grounds stated, defendant's motion for a continuance was addressed to the sound discretion of the trial judge,

and his ruling thereon is not subject to review absent an abuse of discretion. Continuances should not be granted unless some reason is established. *State v. Rigsbee,* 285 N.C. 708, 208 S.E. 2d 656 (1974). No abuse of discretion has been shown.

[4] Defendant's assignment that the court erred in permitting Banks to testify that he and defendant *escaped* from jail on May 16th is patently feckless. This statement introduced Banks' testimony that it was while they were on escape that defendant made contact with that "cold hearted young man," Chuck Lindsey, and that he told Banks he had asked Lindsey to shoot Mrs. Waldo. The purpose of this testimony was not to show that defendant had committed the crime of escape, but to explain the circumstances under which he made the incriminatory statements which Banks related from the witness stand. This assignment is obviously without merit. Equally meritless is the fifth ground upon which defendant contends his conviction should be reversed, that is, that the judge erred "in failing to quash the indictment and in failing to grant his motion for nonsuit." *See State v. Conrad,* 275 N.C. 342, 168 S.E. 2d 39 (1969).

[5] Defendant's final assignments of error raise the question, "Did the trial judge err in allowing hearsay testimony?" The answer is No. The only incompetent hearsay which appears in the record was elicited during the examination of Sergeant Windham, who—for the purpose of corroborating testimony of Swift—was asked to relate what statements Swift had made to him concerning Mrs. Graham and defendant. He testified to one statement which was not corroborative. This testimony, which is quoted in the preliminary statement, was immediately stricken by the judge, who also instructed the jury to disregard it.

We hold that the court's specific instructions to the jury not to consider the stricken statement but to erase it from their minds, was sufficient to prevent any prejudice from it. *See State v. Self,* 280 N.C. 665, 187 S.E. 2d 93 (1972) ; *State v. Moore,* 276 N.C. 142, 171 S.E. 2d 453 (1970). Furthermore, in view of the plenary competent, substantive evidence tending to establish the conspiracy charged, the admission of the stricken evidence was harmless beyond a reasonable doubt. We note that Swift herself testified she delivered to defendant a picture of Mrs. Waldo, which Mrs. Graham had given her. "Unless there is a reasonable possibility that the evidence complained of might have contributed to the conviction, its admission is harmless." *State v. Hudson,* 281 N.C. 100, 106-107, 187 S.E. 2d 756, 761 (1972).

State v. McCotter

After a careful examination of the record and of all defendant's assignments of error, we find no error in the trial below. The decision of the Court of Appeals is

Reversed.

Justice EXUM did not participate in the hearing or decision of this case.