STATE OF NORTH CAROLINA v. FRANKIE JEROME SQUIRE, JOSEPH SEABORN, ALIAS JOE WILLIE, FAYE BEATRICE BROWN

No. 3

(Filed 10 May 1977)

1. Constitutional Law § 80; Homicide § 31.1— first degree murder — life sentence substituted for death penalty

Death sentence imposed upon each defendant in a first degree murder case is vacated and a sentence of life imprisonment is substituted therefor.

2. Criminal Law § 92.1— felony-murder — three defendants — consolidation proper

There was no error in consolidating three cases for trial where the three defendants were charged with and tried for a single, identical crime; the theory of the prosecution in each case was that the three defendants, jointly, and pursuant to a common plan, robbed a bank and, while fleeing from the scene of the robbery with its proceeds, shot and killed a state trooper; and nothing in the record indicated the slightest prejudice to the right of any of the defendants to a fair trial by reason of the consolidation of the cases *per se*. G.S. 15A-926(b)(2).

3. Constitutional Law § 63; Jury § 7— exclusion of jurors for death penalty views — no error

Defendants' contention that the trial court erred in sustaining the State's challenges for cause to prospective jurors who expressed general opposition to capital punishment fails for two reasons: (1) each juror excused pursuant to the State's challenge in this area stated unequivocally that he or she, by reason of opposition to capital punishment, would vote against a verdict of guilty regardless of the evidence, and (2) the Supreme Court in *Witherspoon v. Illinois*, 391 U.S. 510, made it clear that its decision in that case was limited to the validity of a death sentence, imposed upon a verdict of a jury from which persons generally opposed to capital punishment had been excluded, and did not invalidate a conviction and the imposition of a proper sentence upon a verdict of guilty rendered by a jury so composed.

4. Criminal Law § 76.5— no specific finding of waiver of counsel — confession properly admitted

It was not error for the trial court to admit testimony as to a statement made by one defendant to an interrogating officer without

State v. Squire

making the specific finding that defendant had waived her right to counsel, since such finding was implicit in the court's conclusion that the statement to the officer was admissible following the court's finding that the officer fully advised defendant of her right to counsel.

5. **Criminal Law §§ 10, 11— defendants present at crime scene — no accessories before and after the fact**

The trial court in a first degree murder prosecution did not err in failing to submit to the jury the question of defendants' guilt as accessories before the fact and as accessories after the fact where all the evidence was to the effect that the three defendants participated in the robbery of a bank, one of the defendants being the driver of the get-away car parked during the robbery immediately outside the bank, and all the evidence was to the effect that the three defendants, while fleeing from the scene of the robbery, were present at the shooting of a state trooper.

6. **Homicide § 4.2— felony-murder — no conviction for underlying felony**

In a prosecution for murder committed during the perpetration of a bank robbery, the trial court did not err in failing to submit to the jury the guilt of two of the defendants of armed robbery, since defendants were charged with murder and they could not be convicted of the separate, distinct underlying felony of robbery, an offense not charged in the indictment.

7. **Homicide § 4.2— felony-murder — no further prosecution for felony**

When the State, in the trial of a charge of murder, uses evidence that the murder occurred in the perpetration of another felony so as to establish that the murder was a murder in the first degree, the underlying felony becomes a part of the murder charge to the extent of preventing a further prosecution of the defendant for, or a further sentence of the defendant for, commission of the underlying felony.

8. **Indictment and Warrant § 9— purpose of indictment**

The purpose of an indictment is (1) to give the defendant notice of the charge against him to the end that he may prepare his defense and be in a position to plead former acquittal or former conviction in the event he is again brought to trial for the same offense, (2) to enable the court to know what judgment to pronounce in case of conviction.

9. **Criminal Law § 74.2— confession implicating codefendant — admission harmless error**

In a prosecution for murder committed during the perpetration of a bank robbery, the trial court erred in allowing into evidence a statement made to officers by a nontestifying defendant which implicated another defendant, and the trial court's admonition to the jury to dismiss that portion of the statement from its consideration of the implicated defendant's guilt was insufficient to overcome the error; however, in view of the uncontradicted evidence of the involvement of the implicated defendant in the crime charged, such error was harmless beyond a reasonable doubt.

**10. Homicide § 4.2— murder during perpetration of robbery — all conspirators guilty of first degree murder**

Where all defendants not only conspire to perpetrate a robbery, but all actually participate actively in its perpetration, and in the course thereof a killing occurs, all participants are guilty of murder in the first degree.

**11. Homicide § 4.2— felony-murder — underlying felony not terminated prior to killing**

For the purposes of the felony-murder rule, the underlying felony is not deemed terminated prior to the killing merely because the participants have then proceeded far enough with their activities to permit their conviction of the underlying felony.

**12. Homicide § 21.6— felony-murder — homicide during robbery escape — sufficiency of evidence**

A bank robbery was still in progress and the shooting of a state trooper occurred in the perpetration of it and was first degree murder where less than thirteen minutes elapsed between the departure of the defendant robbers from the bank and the fatal shooting of the trooper at a point 10.3 miles from the bank; the money stolen from the bank was in the car with defendants; they still had with them the weapons used in the robbery; two of the defendants were crouched down hiding in the car; defendants believed the state trooper stopped them because he suspected they were the robbers; and after the shooting defendants fled with the money and weapons, attempting to conceal their vehicle, and then hid in a bean field until flushed out by officers.

APPEAL by defendants from *Webb, J.,* at the 5 January 1976 Session of MARTIN.

Upon indictments, each proper in form, the defendants were tried for and convicted of murder in the first degree, the cases being consolidated for trial over their objections. Each defendant was sentenced to death. Though represented at trial and on appeal by separate counsel, the defendants filed a joint brief on appeal and their appeals were argued jointly by a single counsel.

None of the defendants offered evidence at the trial. That introduced by the State was to the following effect:

At 10 a.m. on 2 September 1975, the Branch Banking & Trust Company in Jamesville was held up and robbed by a Negro man, armed with a sawed-off shotgun, and a Negro woman, armed with a pistol. Without objection, the woman was positively identified in court as the defendant Brown. Without objection, the man was likewise identified in court as

the defendant Seaborn. A few moments prior to the robbery, bank employees had observed these two defendants walking in the bank parking lot and entering a brown Pontiac automobile parked on the street, which automobile immediately departed, thus indicating that it was driven by a third person. Very shortly thereafter, the same automobile returned to the bank and the robbery took place. The police were immediately notified and numerous police vehicles converged upon the Jamesville-Williamston area.

At approximately 10:15 a.m., Trooper Guy Thomas Davis, Jr., of the State Highway Patrol, with the use of his siren and blue flashing light, stopped a brown Pontiac at an intersection in Williamston, 10.3 miles from the bank in Jamesville. Apparently, his reason for doing so was some observed violation of the traffic laws. Trooper Davis approached the Pontiac automobile and spoke to the driver. He was immediately shot in the throat by a shotgun, fired from the back seat of the automobile where the defendant Seaborn was lying. Trooper Davis died almost instantly and the Pontiac automobile drove away. Without objection, a bystander positively identified in court the defendant Squire as the driver of the vehicle.

At approximately 11 a.m., a brown Pontiac was found by the officers, abandoned in a creek bottom. It bore no license plate but there were indications that a license plate had recently been removed therefrom and such plate was discovered in a nearby stream. The owner of this vehicle had lent it to the defendant Seaborn that morning. Bloodstains were found on the outside of the door next to the driver's seat and fingerprints of the defendants Squire and Seaborn were lifted from the interior of the vehicle. The vehicle was positively identified, by employees of the bank, as the one used by the robbers and, by the bystander, as the vehicle so stopped by Trooper Davis.

At approximately 2:30 p.m., a detachment of officers surrounded and began the search of a field of soybeans, growing nearly head-high, not far from the place where the Pontiac car had been discovered in the creek bottom. The downdraft from a police helicopter, hovering over the field, blew aside the bean vines so that one of the officers observed a person lying on the ground beneath the vines. Upon being ordered to come out with their hands raised, the three defendants arose and were handcuffed and taken into custody.

In the immediate vicinity from which the defendant Brown arose, the officers discovered a woman's pocketbook containing a large sum of money, including a package of "bait money," identified as having been taken from the bank in Jamesville in the course of the robbery. A pistol was also found lying on the ground at this point. Approximately an hour later, officers, equipped with a metal detector, searched the area in the soybean field from which the defendant Seaborn had arisen and found, shallowly buried, the stock and barrel of a sawed-off shotgun. The barrel, when so found, contained an exploded shell, which had been fired in that gun. In the back seat of the Pontiac car found in the creek bottom, the officers found a shotgun fore-arm stock and another shotgun shell. The barrel, stock and fore-arm stock were fitted together and formed a completed weapon, which was positively identified by a dealer in weapons as one sold by him some time previously to a woman who, in turn, testified that she gave it to her husband as a gift. The husband testified that he had lent this weapon to the defendant Squire approximately a year before the robbery and Squire never returned it.

Shortly after the three defendants were captured in the soybean field, they were taken to the police station in Williamston and, after each was given the customary warning of his constitutional rights as required in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694 (1966), each was separately interrogated by investigating officers.

In that interrogation, the defendant Seaborn admitted his participation in the bank robbery and that, as the automobile used in the robbery proceeded from the bank toward Williamston, he was lying down in the back seat. He further stated that when the automobile stopped and Trooper Davis walked up to it, he, Seaborn, grabbed for the shotgun lying on the floor of the car and as he started to get up the gun discharged, following which the car started up and moved on and, after it had traveled a short period, it stopped again, whereupon he left the car and fled and hid in the "pea field." He further stated that he shot the trooper but did not intend to do so, the gun firing accidentally.

The defendant Brown told the officer interrogating her that she participated in the bank robbery, following which she got in the car and lay down in the front seat. In a short while she

heard a siren and then a loud shot. Thereafter, she said, the car came to a stop in a wooded area, she got out and went through the woods to the soybean field in which she was arrested.

The defendant Squire told the officer interrogating him that he drove the Pontiac car to the bank and remained in it, that after leaving the bank he drove toward Williamston and, after passing through an intersection, he observed a patrol car behind him, the blue light of which was flashing, so he stopped. He then said that when the officer approached the Pontiac car and looked into the vehicle he, Squire, heard a "blast from a gun" and the officer fell, following which Squire drove away at a rapid rate of speed through Williamston and stopped in a wooded area where he took the license plate off the vehicle and threw the license place into the woods en route to the soybean field where he was arrested. Over objection, the officer testified that Squire told him the shot came from the rear seat of the car and that, just prior to the shot, Squire, himself, said, "Don't, don't, Joe Willie, don't." The court instructed the jury to dismiss the last statement from its consideration in reaching its verdict.

The following timetable of events is disclosed by this evidence:

At 9:30 a.m., defendants Seaborn and Brown were observed walking in the bank parking lot past the drive-in window of the bank and getting in a brown Pontiac car parked upon the street, which car immediately moved off toward Williamston. At 9:55 a.m., the car returned to the bank parking lot. At 10 a.m., the defendants Brown and Seaborn entered the bank armed with a pistol and shotgun, respectively, and a bank employee, then on the telephone, informed the person she was calling that a robbery was in progress. At 10:05 a.m., the robbery was complete and the robbers left the bank. At 10:18 a.m., a fellow officer, having observed Trooper Davis lying on the street 10.3 miles from the bank, made a radio call for the rescue squad. At 11 a.m., the brown Pontiac car was discovered abandoned in the creek bottom. Shortly after 2:30 p.m., the defendants were discovered in the soybean field. At approximately 2:40 p.m., their handcuffing and arrests were completed and they were removed from the field for transportation to the Williamston Police Station. During this ten minute period, the arresting officers discovered the handbag containing the money

and the pistol and looked unsuccessfully for the shotgun. An investigating officer interviewed the defendant Squire, beginning at approximately 3:30 p.m., after giving him the customary Miranda warning, and obtained from him the above mentioned statement. At approximately 5 p.m., this interview ceased. At 3:50 p.m., defendant Brown was interviewed by an investigating officer after she had been advised of her constitutional rights as speciifed in *Miranda v. Arizona, supra.* This interview lasted approximately one hour. At the conclusion of these interviews, the defendants were fingerprinted and photographed.

Before admitting testimony as to the above mentioned admissions by the three defendants, the court conducted extensive voir dire examinations and found facts, fully supported by the evidence at the voir dire as to each such defendant to the effect that such defendant was fully advised of his constitutional rights as stated in *Miranda v. Arizona, supra,* and that each such defendant fully understood those rights and knowingly, voluntarily and understandingly waived his right to counsel and his right to remain silent. Consequently, the court concluded that the said evidence of such admission by such defendant was admissible.

In his charge to the jury, the judge instructed that the State was proceeding as to all three defendants upon the theory of felony murder; that is, that Trooper Davis was shot and killed by a person committing or attempting to commit armed robbery and, as to the defendant Seaborn, the State was also proceeding upon the theory of murder with premeditation and deliberation.

With reference to the theory of felony murder, the court instructed the jury that the State must prove beyond a reasonable doubt, as to the defendant in question, that such defendant "either acting alone or acting together with one or more of the other defendants perpetrated an armed robbery." He instructed that if two or more persons act together with a common purpose to commit an armed robbery, each of them is held responsible for the acts of the others done in the commission of the robbery. He further charged:

"Now an armed robbery, sometimes called robbery with a firearm, is the taking and carrying away the personal property of another from his person or in his presence

State v. Squire

without his consent by endangering or threatening a person's life with a firearm, the taker knowing he was not entitled to take the property and intending to deprive another of its use permanently.

\*     \*     \*     \*

"Now a shooting is done in the perpetration of a robbery within the purview of the law when it is linked to the robbery or is part of a series of transactions so connected with the robbery that there is no break in the chain of events leading from the robbery to the shooting. Now flight from the scene of the robbery would be a part of the robbery. So that if you are satisfied from the evidence and beyond a reasonable doubt that any one of the defendants, acting either alone or as part of a plan with either one or both of the other defendants, participated in a robbery and was fleeing from the scene of the robbery without any break in the flight, and that while he or she was so fleeing either he or she or one of the other defendants with whom he or she was so acting shot Guy Thomas Davis, that is evidence from which you may conclude that the said defendant shot Guy Thomas Davis in the perpetration of a robbery. However, you are not compelled to do so. You will consider this evidence along with all the other evidence in this case and be satisfied beyond a reasonable doubt that the shooting occurred in the perpetration of a robbery before you so conclude."

As to the defendant Seaborn, the court instructed the jury that if it were not satisfied beyond a reasonable doubt that Seaborn was guilty of murder in the perpetration of a felony, it must then determine whether or not he was guilty of first degree murder with premeditation and deliberation, instructing the jury as to the elements of that type of first degree murder.

The verdict of the jury does not specify whether the jury found the murder to have been committed in the perpetration of a felony but, since the jury found the defendants Brown and Squire guilty, it is evident that it did so on the theory of felony murder.

*Rufus L. Edmisten, Attorney General, by James E. Magner, Jr., Assistant Attorney General, for the State.*

*James S. Livermon, Jr., for defendant Squire.*

*Charles W. Ogletree for defendant Brown.*

*Milton Moore for defendant Seaborn.*

*W. Brian Howell for defendants.*

LAKE, Justice.

[1]  By virtue of the decision of the Supreme Court of the United States in *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed. 2d 944 (1976), the death sentence imposed upon each of these defendants must be, and is hereby, vacated and a sentence to life imprisonment substituted therefor as hereinafter provided.

[2]  There was no error in consolidating the three cases for trial. G.S. 15A-926(b)(2); *State v. Slade,* 291 N.C. 275, 229 S.E. 2d 921 (1976); *State v. Covington,* 290 N.C. 313, 226 S.E. 2d 629 (1976); *State v. King,* 287 N.C. 645, 215 S.E. 2d 540 (1975). The three defendants were charged with and tried for a single, identical crime, the murder of Trooper Davis. The theory of the prosecution in each case was that the three defendants, jointly, and pursuant to a common plan, robbed the bank in Jamesville and, while ·fleeing from the scene of the robbery with its proceeds, shot and killed Trooper Davis. Nothing whatever in the record indicates the slightest prejudice to the right of any of the defendants to a fair trial by reason of the consolidation of the cases *per se.* We discuss below the contention that a new trial should be ordered because of the admission into evidence of testimony of an investigating officer concerning the extrajudicial statement by the defendant Squire to him.

[3]  Defendants next contend that the trial court erred in sustaining the State's challenges for cause to prospective jurors who expressed general opposition to capital punishment. This assignment of error fails for two reasons, each of which is independently sufficient. *First,* the record discloses that no juror was excused because of his or her expression of general opposition to capital punishment. Each juror excused, pursuant to the State's challenge in this area, stated unequivocally that he or she, by reason of opposition to capital punishment, would vote against a verdict of guilty regardless of the evidence. The sustaining of such challenge to such juror was proper under the rule established in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed. 2d 776 (1968), and would not be basis even for vacat-

ing a death sentence, otherwise properly imposed. *Second,* the Supreme Court of the United States in *Witherspoon v. Illinois, supra,* made it clear that its decision in that case was limited to the validity of a death sentence, imposed upon a verdict of a jury from which persons generally opposed to capital punishment had been excluded, and did not invalidate a conviction and the imposition of a proper sentence upon a verdict of guilty rendered by a jury so composed. Speaking through Justice Branch, in *State v. Covington, supra,* at p. 348, this Court said:

> "All defendants, relying upon *Witherspoon v. Illinois,* 391 U.S. 510, 20 L.Ed. 2d 776, 88 S.Ct. 1770, contend that their constitutional rights were violated by the exclusion of jurors because of their views concerning capital punishment. Their contention requires little discussion in light of the holding in *Woodson v. North Carolina* [*supra*]. In *Witherspoon,* the Supreme Court made it clear that the decision did not invalidate the conviction of a defendant as opposed to a sentence of death. * * * We hold that defendants' constitutional rights were not violated by the exclusion of jurors because of their views concerning capital punishment."

Except with reference to the portion of the statement by the defendant Squire tending to implicate his codefendant Seaborn as the one who shot Trooper Davis, which we discuss below, there was no error in admitting, over objection, testimony of investigating officers as to extrajudicial admissions made to them by the several defendants. As to each such statement, the court, upon objection being interposed, conducted a voir dire in the absence of the jury. The defendant Squire and the defendant Brown offered no evidence at such voir dire. The defendant Seaborn did offer evidence tending to contradict the evidence offered by the State with reference to his having been properly advised of his constitutional rights, his waiver of counsel and the voluntariness of his statement.

As to the defendants Seaborn and Squire, the State offered, on voir dire, signed waivers of counsel and acknowledgments of the reading to them and understanding by them of their said constitutional rights. At the conclusion of the voir dire, the court made findings of fact to the effect that each defendant had been fully advised of his or her said rights, that defendants Seaborn and Squire had each, with full understanding of those

rights, knowingly, voluntarily and understandingly waived his right to counsel and his right to remain silent and that the defendant Brown, having been so advised of her rights and understanding them, knowingly, voluntarily and understandingly waived her right to remain silent. Upon these findings, the court concluded that the statements of the several defendants were admissible in evidence. The investigating officers were thereupon permitted to testify concerning these statements in the presence of the jury.

[4] It is well established that such findings of fact by the trial court upon the voir dire hearing, if supported by evidence, as these findings were, are conclusive on appeal. *State v. Fox,* 277 N.C. 1, 175 S.E. 2d 561 (1970) ; *State v. McRae,* 276 N.C. 308, 172 S.E. 2d 37 (1970) ; *State v. Bishop,* 272 N.C. 283, 158 S.E. 2d 511 (1968) ; *State v. Gray,* 268 N.C. 69, 150 S.E. 2d 1 (1966). It will be observed that, as to the defendant Brown, the court did not expressly find that she waived her right to counsel prior to making a statement to the interrogating officer. However, this finding is implicit in the court's conclusion that her statement to the officer was admissible following the court's finding that the officer fully advised her of her right to counsel. That finding is fully supported by the evidence on the voir dire hearing which also showed an express oral waiver by the defendant Brown of her right to counsel. There was no evidence to the contrary. That being true, it was not error for the judge to admit testimony as to the statement by the defendant Brown without making the specific finding that she had waived her right to counsel. *State v. Lynch,* 279 N.C. 1, 15, 181 S.E. 2d 561 (1971) ; *State v. Bishop, supra,* at p. 291 (1968) ; *State v. Keith,* 266 N.C. 263, 145 S.E. 2d 841 (1966). There was, therefore, no error in the admission of the evidence of the statements by the several defendants to the investigating officers, except to the extent hereinafter set forth.

[5] The defendants Squire and Brown requested the court to submit to the jury, with proper instructions, the question of their guilt as accessories before the fact and as accessories after the fact. This request was denied and in this there was no error. *State v. Phifer,* 290 N.C. 203, 225 S.E. 2d 786 (1976). Assuming, for the sake of argument, that the offense of being an accessory before the fact, or the offense of being an accessory after the fact, is a lesser included offense within the charge of murder, as to which see the several opinions of our predecessors on this

State v. Squire

Court in *State v. Jones,* 254 N.C. 450, 119 S.E. 2d 213 (1961), it is well established that the trial court is under a duty to instruct the jury upon, and to submit for its consideration, a lesser included offense only when there is evidence tending to show the commission of such lesser offense. *State v. Phifer, supra; State v. Jarrette,* 284 N.C. 625, 202 S.E. 2d 721 (1974) ; *State v. Foster,* 284 N.C. 259, 277, 200 S.E. 2d 782 (1973) ; *State v. Williams,* 275 N.C. 77, 165 S.E. 2d 481 (1969) ; *State v. Hicks,* 241 N.C. 156, 84 S.E. 2d 545 (1954).

All persons present, actually or constructively, and participating in a criminal offense are principals therein, either in the first or second degree, and not accessories. *State v. Phifer, supra,* at p. 217; *State v. Overman,* 284 N.C. 335, 200 S.E. 2d 604 (1973) ; *State v. Benton,* 276 N.C. 641, 174 S.E. 2d 793 (1970). "An accessory before the fact is one *who was absent from the scene when the crime was committed* but who procured, counseled, commanded or encouraged the principal to commit it." (Emphasis added.) *State v. Benton, supra.* "An accessory after the fact under G.S. 14-7 'is one who, *knowing* that a felony has been committed by another, receives, relieves, comforts, or assists such other, the felon, or in any manner aids him to escape arrest or punishment.' *State v. Potter,* 221 N.C. 153, 19 S.E. 2d 257 (1942)." *State v. Overman, supra,* at p. 341. In the present case, all of the evidence is to the effect that the three defendants participated in the robbery of the bank in Jamesville, Squire being the driver of the get-away car parked during the robbery immediately outside the bank, and all the evidence is to the effect that the three defendants, while fleeing from the scene of the robbery, were present at the shooting of Trooper Davis.

[6] Likewise, there was no error in the failure of the court to submit to the jury the guilt of the defendants Squire and Brown of the offense of armed robbery. The jury was properly instructed as to the elements of armed robbery as the felony underlying the alleged murder. The argument of these defendants upon this contention is to this effect: The evidence was overwhelming that these defendants had participated in the robbery of the bank; if the jury determined that the robbery was not in progress at the time Trooper Davis was killed, the jury could not convict these defendants of murder; "The jury was not, under any circumstances, going to find them not guilty"; thus, under the circumstances of this case, robbery was a lesser in-

cluded offense and should have been submitted to the jury as to these defendants as an alternative to convicting them of murder; otherwise, the jury was virtually forced to find the robbery was still in progress at the time Trooper Davis was shot. The sufficient answer is that on this trial the defendants were not charged with armed robbery, but with murder.

[7, 8] It is true that the State was proceeding in the murder case on the theory of felony-murder; that is, that the murder was committed in the perpetration of the felony of robbery. It is also true that, when the State, in the trial of a charge of murder, uses evidence that the murder occurred in the perpetration of another felony so as to establish that the murder was a murder in the first degree, the underlying felony becomes a part of the murder charge to the extent of preventing a further prosecution of the defendant for, or a further sentence of the defendant for, commission of the underlying felony. *State v. Thompson,* 280 N.C. 202, 185 S.E. 2d 666 (1972). It does not follow, however, that upon an indictment charging murder alone, the defendant can be convicted of a separate, distinct underlying felony such as armed robbery. He may be convicted only of the offense charged in the indictment. "It is a universal rule that an indictment must allege all the elements of the offense charged. A defendant is entitled to be informed of the accusation against him and to be tried accordingly." *State v. Riera,* 276 N.C. 361, 172 S.E. 2d 535 (1970). "A charge in a bill of indictment must be complete in itself, and contain all of the material allegations which constitute the offense charged." *State v. Guffey,* 265 N.C. 331, 144 S.E. 2d 14 (1965). "The purpose of an indictment 'is (1) to give the defendant notice of the charge against him to the end that he may prepare his defense and to be in a position to plead former acquittal or former conviction in the event he is again brought to trial for the same offense; (2) to enable the court to know what judgment to pronounce in case of conviciton.' *State v. Burton,* 243 N.C. 277, 90 S.E. 2d 390 (1955); *State v. Greer,* 238 N.C. 325, 77 S.E. 2d 917 (1953); *State v. Dorsett* and *State, v. Yow,* 272 N.C. 227, 158 S.E. 2d 15 (1967)." *State v. Russell,* 282 N.C. 240, 192 S.E. 2d 294 (1972). Since the defendants Squire and Brown could not have been lawfully convicted, upon the present indictments, of the crime of armed robbery, it was not error to refuse to submit their guilt of that offense to the jury.

We come now to the question of the effect upon the convictions of these defendants of the admission in evidence of the testimony of the investigating officer concerning the extrajudicial statement made to him by the defendant Squire, which statement implicated the defendant Seaborn as the one who fired the fatal shot.

The admission of this statement was not error as to the declarant, Squire. As above noted, the statement was lawfully obtained and admissible insofar as the procedures followed by the interrogating officer are concerned. "A confession legally obtained is clearly competent against the defendant who made it and the best evidence of his guilt." *State v. Fox,* 274 N.C. 277, 163 S.E. 2d 492 (1968).

The statement by Squire did not refer to the defendant Brown, directly or indirectly. The defendant Brown's own statement to the officer interrogating her was to the effect that when the shot was fired, she was lying in the front seat of the car. There was no evidence to the contrary. Thus, Squire's statement that the shot was fired from the back seat of the car would not imply or indicate that the defendant Brown was the person who actually fired it. The admission of this evidence was, therefore, not prejudicial to the defendant Brown. Thus, neither the defendant Squire nor the defendant Brown would be entitled to a new trial because of the admission of the testimony of this statement by the defendant Squire.

[9]   As to the defendant Seaborn, the admission of the officer's testimony concerning this statement by the codefendant Squire was error, this being, clearly, hearsay evidence that Seaborn fired the fatal shot. Obviously, in a separate trial of Seaborn such testimony would not have been admissible over his objection. The trial judge, obviously taken by surprise by this testimony of the officer in the presence of the jury, immediately sought to rectify the error by instructing the jury to dismiss that portion of Squire's statement to the officer from its consideration of Seaborn's guilt. However, since the decision of *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed. 2d 476 (1968), it is well settled that such admonition to the jury is not sufficient to overcome the error as to the codefendant so implicated by the statement of the declaring defendant. Where, as in *Bruton v. United States, supra,* and as in the present case, the declarant does not, himself, take the witness stand and thus subject himself to cross-examination by his

codefendant implicated by the statement to the officer, the co-defendant's constitutional right to confront his accusor is violated. This violation of his constitutional right of confrontation is not erased by the admonition of the trial judge to the jury to strike the offending evidence from its consideration. Thus, speaking through Justice Sharp, now Chief Justice, we said in *State v. Fox*, 274 N.C. 277, 163 S.E. 2d 492 (1968) :

> "The result [of *Bruton v. United States, supra*] is that in joint trials of defendants it is necessary to exclude extrajudicial confessions unless all portions which implicate defendants other than the declarant can be deleted without prejudice either to the State or the declarant. If such deletion is not possible, the State must choose between relinquishing the confession or trying the defendants separately. The foregoing pronouncement presupposes (1) that the confession is inadmissible as to the codefendant * * * and (2) that the declarant will not take the stand. If the declarant can be cross-examined, a codefendant has been accorded his right to confrontation."

It does not follow, however, that the defendant Seaborn is entitled to a new trial. Like any other defendant, Seaborn was "entitled to a fair trial, not a perfect one." *Lutwak v. United States*, 344 U.S. 604, 619, 73 S.Ct. 481, 97 L.Ed. 593 (1953). In *Schneble v. Florida*, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed. 2d 340 (1972), the Supreme Court of the United States expressly applied the well established doctrine of harmless error to a recognized violation of the rule declared in *Bruton v. United States, supra,* saying, through Mr. Justice Rehnquist:

> "The mere finding of a violation of the *Bruton* rule in the course of the trial, however, does not automatically require reversal of the ensuing criminal conviction. In some cases the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error.

> \*    \*    \*

> "Having concluded that petitioner's [the complaining defendant's own] confession was considered by the jury, we must determine on the basis of 'our own reading of the record and on what seems to us to have been the

State v. Squire

probable impact * * * on the minds of an average jury,'
* * * whether Snell's [the declaring codefendant's] ad-
missions were sufficiently prejudicial to petitioner as to
require reversal. * * * Thus, unless admitted evidence
contributed to the conviction, reversal is not required.
See *Chapman v. California,* 386 U.S. 18, 24, 17 L.Ed. 2d
705, 710, 87 S.Ct. 824, 24 A.L.R. 3d 1065 (1967). In this
case, we conclude that the 'minds of an average jury' would
not have found the State's case significantly less persuasive
had the testimony as to Snell's admission been excluded.
The admission into evidence of these statements, therefore,
was at most harmless error."

In *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17
L.Ed. 2d 704 (1967). The Supreme Court of the United States,
speaking through Mr. Justice Black, said:

"We are urged by petitioners to hold that all federal
constitutional errors, regardless of the facts and circum-
stances, must always be doomed harmful. * * * We decline
to adopt any such rule. * * * We conclude that there may
be some constitutional errors which in the setting of a par-
ticular case are so unimportant and insignificant that they
may, consistent with the federal constitution, be deemed
harmless, not requiring the automatic reversal of the con-
viction.

*         *         *

"We, therefore, do no more than adhere to the meaning
of our *Fahy* Case [*Fahy v. Connecticut,* 375 U.S. 85, 84
S.Ct. 229, 11 L.Ed. 2d 171 (1963)] when we hold, as we
now do, that before a federal constitutional error can be
held harmless, the Court must be able to declare a belief
that it was harmless beyond a reasonable doubt."

This doctrine of harmless error is likewise firmly estab-
lished in the law of this State. *State v. McCotter,* 288 N.C.
227, 217 S.E. 2d 525 (1975) ; *State v. Watson,* 281 N.C. 221, 188
S.E. 2d 289 (1972), cert. den., 409 U.S. 1043; *State v. Hudson,*
281 N.C. 100, 187 S.E. 2d 756 (1972), cert. den., 414 U.S. 1160.
In the latter case, we said, through Justice Huskins:

"We have consistently held that the admission of
evidence which is technically incompetent will be treated as
harmless unless it is made to appear that defendant was

prejudiced thereby and that a different result likely would have ensued had the evidence been excluded."

The defendant Seaborn's own statement to the officer interrogating him following his arrest, evidence as to which was properly admitted by the trial court as above seen, was that he was in the back seat of the car when Trooper Davis approached, that he reached for the shotgun lying on the floor of the car and, as he raised up, the gun discharged and inflicted the fatal wound. Seaborn's statement to the officer was that he did not intend to kill Trooper Davis, the firing of the gun being accidental. The admitted testimony as to the statement of the defendant Squire is not inconsistent with this assertion by Seaborn.

The evidence is overwhelming, including the statements of each of three defendants, that all three of the defendants participated actively in the robbery of the bank in Jamesville, Squire being the driver of the car used to transport Seaborn and Brown to the bank for the purpose of robbery and of escape. The uncontradicted evidence is: The robbery was completed at 10:05 a.m.; at 10:18 a.m., Trooper Davis lay mortally wounded on the street, 10.3 miles distant from the bank, following a shotgun blast from the car in which the three defendants were making their escape; the shotgun used in the bank robbery fired the exploded shell found in the breach end of the barrel thereof following the killing of Trooper Davis and the arrest of the defendants in the soybean field; following the shooting of Trooper Davis, the three defendants drove the car to a point in a creek bottom where they abandoned it, after removing the license plate therefrom, and then fled on foot with the proceeds of the bank robbery to the point where they were arrested, hiding under a growing crop of soybeans; beside them was a woman's pocketbook containing the proceeds of the bank robbery and the pistol used by the defendant Brown in the robbery; shallowly buried within a few feet from where they were hiding were the barrel and the stock of the shotgun. In the face of this uncontradicted evidence, it would be preposterous to suggest that the jury would not have convicted Seaborn but for the statement by his codefendant Squire tending to put Seaborn in the back seat of the car and to show that the actual shot came from that portion of the car. The error in admitting the incompetent testimony of Squire must, therefore, be deemed harmless beyond a reasonable doubt.

It is true that the court submitted to the jury as to the defendant Seaborn both felony-murder and first degree murder by premeditation and deliberation. However, a finding of the guilt of Squire and Brown was limited in the court's instruction to the possibility of guilt of felony-murder. The verdict of the jury, finding all three guilty of first degree murder, shows clearly that the jury found the killing of Trooper Davis occurred while the defendants were engaged in the perpetration of the felony of bank robbery.

G.S. 14-17 declares that a murder committed in the perpetration of any robbery shall be deemed murder in the first degree. In *State v. Thompson, supra,* speaking through Chief Justice Bobbitt, this Court said:

"An interrelationship between the felony and the homicide is prerequisite to the application of a felony-murder doctrine. * * * A killing is committed in the perpetration or attempted perpetration of a felony within the purview of a felony-murder statute 'when there is no break in the chain of events leading from the initial felony to the act causing death, so that the homicide is linked to or part of the series of incidents, forming one continuous transaction.' 40 Am. Jur. 2d, Homicide § 73."

As Justice Sharp, now Chief Justice, said in *State v. Fox,* 277 N.C. 1, 175 S.E. 2d 561 (1970):

"[W]hen a conspiracy is formed to commit a robbery or burglary, and a murder is committed by any one of the conspirators in the attempted perpetration of the crime, each and all of the conspirators are guilty of murder in the first degree."

[10] To the same effect is *State v. Covington, supra.* Necessarily, where all of the defendants not only conspire to perpetrate a robbery, but all actually participate actively in its perpetration, and in the course thereof a killing occurs, all participants are guilty of murder in the first degree. *State v. Phifer, supra.*

[11] For the purposes of this rule, the underlying felony is not deemed terminated prior to the killing merely because the participants have then proceeded far enough with their activities to permit their conviction of the underlying felony.

In the annotation entitled "Felony Murder Rule-Termination Of Felony," 58 A.L.R. 3d 851, it is said:

> "The vast majority of cases within the scope of this annotation support the view that escape is ordinarily within the *res gestae* of the felony and that a killing committed during escape or flight. is ordinarily within the felony-murder rule."

The Supreme Court of California so held in *People v. Salas*, 7 Cal. 3d 812, 103 Cal. Rptr. 431, 500 P. 2d 7, 58 A.L.R. 3d 832 (1972), cert. den., 410 U.S. 939, saying:

> "In the present case * * * the homicide was committed before defendant had reached a place of safety while he 'was in hot flight with the stolen property and in the belief that the officer was about to arrest him for the robbery.' Deputy O'Neal commenced to follow defendant's vehicle within three minutes of the time defendant left the bar [the scene of the robbery] and the killing [of the officer] occurred within six or seven minutes of that time. Thus the robbery was still in the escape stage, as conceded by the defendant at trial."

[12] In the present case, less than thirteen minutes elapsed between the departure of the defendant robbers from the bank and the fatal shooting of Trooper Davis at a point 10.3 miles from the bank. The money stolen from the bank was in the car with the defendants. They still had with them the weapons used in the robbery. According to the defendants' own statements, one was hiding, crouched down in the back seat, another hiding, crouched down in the front seat. Pursuant to the alarm, police officers in various vehicles were converging upon the area. The defendant Squire, the driver of the get-away car, had observed three such vehicles, with flashing lights, meeting him as the officers drove toward the robbed bank. It is apparent that the defendants believed, though seemingly erroneously, that Trooper Davis had stopped them because he suspected they were the robbers. After the shooting, they fled with the money and the weapons, attempted to conceal their vehicle and then lay hiding in a bean field until flushed by the pursuing officers. Obviously, the defendants had not reached what they regarded as a place of temporary safety from pursuing officers when the shooting of Trooper Davis occurred. Thus, the robbery was still in prog-

ress and the shooting occurred in the perpetration of it and was first degree murder.

By virtue of the decision of the Supreme Court of the United States in *Woodson v. North Carolina, supra,* we must, and do, vacate the sentence of death imposed upon each of the defendants and, under the authority of Session Laws of 1973, Chapter 1201, § 7, substitute a sentence of life imprisonment as to each such defendant. Accordingly, this cause is remanded to the Superior Court of Martin County, with direction that the Presiding Judge, without requiring the presence of the defendants, or any of them, shall enter, as to each defendant, a judgment sentencing such defendant to life imprisonment in lieu of the sentence of death heretofore imposed upon him or upon her for the first degree murder of which the defendants have been convicted. Further, in accordance with this judgment, the Clerk of the Superior Court will issue, as to each defendant, a new commitment in substitution for the commitment heretofore issued. At the same time, the Clerk will furnish to each defendant and to his or her attorney a copy of the judgment and commitment as revised in accordance with this opinion.

No error as to the verdict.

Death sentence vacated and remanded for imposition of sentence to life imprisonment as to each defendant.