No. 21796.

JOEL K. WHITMAN *v.* THE PEOPLE OF THE
STATE OF COLORADO.
(420 P.2d 416)

Decided November 21, 1966.    Rehearing denied December 12, 1966.

John J. Gaudio, for plaintiff in error.

Duke W. Dunbar, Attorney General, Frank E. Hickey, Deputy, Robert C. Miller, Assistant, for defendant in error.

*En Banc.*

Mr. Justice McWilliams delivered the opinion of the Court.

By direct information Joel K. Whitman and Gary Dewane Adamson were jointly charged with murder in the first degree, namely, the felonious, wilful and premeditated killing and murder of one Walter F. Hamilton. Whitman entered a plea of not guilty to this charge, and thereafter sought and obtained a trial separate from that of his co-defendant Adamson. Upon trial, Whitman was convicted of murder in the first degree and the jury fixed his sentence at life imprisonment. By writ of error Whitman now seeks reversal of this judgment and sentence.

It was the People's theory of the case that under C.R.S. 1963, 40-2-3, this was a so-called "felony-murder"

situation. This particular statute provides, in part, that a "murder which is committed in the perpetration or attempt to perpetrate any . . . . robbery . . . . shall be deemed murder in the first degree."

Accordingly, the People offered evidence tending to establish that Adamson, at gunpoint, robbed the proprietor of a South Denver creamery of approximately one hundred dollars, this sum consisting of currency only. Prior to this robbery, Whitman and Adamson, who were then residing in the Colorado Springs area, had together driven to Denver in an automobile belonging to Whitman's sister. Although this was a controverted issue of fact, there nevertheless was evidence that the gun which Adamson used in the holdup had been given him by Whitman. During the robbery Whitman sat in the car which was parked around the corner from the aforementioned creamery.

As Adamson was leaving the creamery, two Denver police officers stopped their squad car, purely by chance, directly in front of this establishment. As the result of certain "signaling" by the victim of the robbery, the two officers decided to follow Adamson, who proceeded on foot at a rather swift pace to the waiting car in which Whitman was sitting behind the steering wheel. Whitman then pulled away quickly from the curb and the officers proceeded to give chase. Midway through the chase, the officers noted currency coming from the window of the pursued vehicle. This chase was a high speed one, up to one hundred miles per hour, with the Whitman driven vehicle running half a dozen stop signs and several signal light controlled intersections.

The chase came to an abrupt and tragic ending at East First Avenue and University Boulevard. There, Whitman drove his vehicle into the intersection at a very high rate of speed and on a "red" or "stop" light. In so doing he struck another vehicle innocently proceeding through the intersection on a "green" or "go"

light, and the driver of this other vehicle died from the injuries which he received in this violent collision.

Whitman's theory of the case was that he was an innocent victim of circumstances. His testimony was that he had no idea that Adamson intended to rob the creamery, and that in this regard Adamson had merely told him that he wanted to buy some cigarettes. Whitman denied that it was his gun that Adamson used in the robbery and testified that he actually didn't know that Adamson even had any weapon until Adamson returned to the car. Then, according to Whitman, Adamson pulled the gun on him and told him the police were on their trail. Whitman went on to testify that while he thereafter did drive the car at breakneck speed in an effort to elude the police, he did so only because Adamson "put the gun in his ribs" and threatened his life.

It was on this general state of the record, with the aforementioned sharp dispute in the evidence, that the jury returned its verdict adjudging Whitman guilty of murder in the first degree and fixing his sentence at life imprisonment in the state penitentiary.

Whitman initially contends that this judgment and sentence must be reversed because, in his view, there was no evidence that he was a "party" to any robbery, either as a principal or as an accessory thereto. In thus asserting, Whitman completely overlooks the People's evidence and apparently chooses, for obvious and understandable reasons, to look upon the evidence offered by him in his defense as being the only evidence in the record. In our analysis of the evidence the People very definitely made out a *prima facie* case tying Whitman into the robbery as an accessory. C.R.S. 1963, 40-1-12.

We agree with the general assertion that quite probably the evidence offered by Whitman, *if believed by the jury,* would have absolved him of any criminal responsibility in this entire transaction. In other words, if the jury believed that Whitman did not "stand by"

and aid, abet or assist, and if they were of the further view that he had not theretofore advised and encouraged the perpetration of the robbery, then he would not be guilty of any felony-murder.

The answer to all this, though, is that the jury obviously chose to *disbelieve* Whitman's testimony in these several particulars, and by its guilty verdict indicated that it chose to adopt the People's theory of the case and the evidence offered in support thereof. In short, there is much competent evidence that Whitman did participate in this robbery as an accessory, as such is defined in C.R.S. 1963, 40-1-12.

Whitman next argues that there was insufficient evidence of any *murder,* as opposed to homicide, having been committed in the perpetration of this robbery. We think this suggestion is without merit, and we shall set forth our views in this regard.

C.R.S. 1963, 40-2-3 does provide, in part, that "all *murder* . . . . which is committed in the perpetration . . . . [of] . . . . any robbery . . . . shall be deemed murder in the first degree . . . ." (Emphasis supplied.) However, as applied to the instant case, this does not mean that there must be evidence establishing first degree murder which is independent and apart from the robbery out of which the homicide arose. In 26 Am. Jur. p. 183 appears the following:

"In Commission of Another Felony. — Many statutes include in first-degree murder homicides that are committed in the perpetration of all or certain specified felonies. Under most such statutes, no design to effect death is essential, the murder being of the first degree although casual and unintentional. The turpitude of the felonious act is deemed to supply the element of deliberation or design to effect death. Under some such statutes, however, there must be an intentional killing in this type of murder as well as in the deliberate and premeditated type, although it is not necessary to show deliberate and premeditated malice."

█ Colorado would appear to be in accord with the general rule that the turpitude of the felonious act, in this case robbery, supplies the element of deliberation and design to effect death, and that therefore no express or implied design to effect death is essential and the murder is still of first degree though "casual and unintentional." See, in this regard, *Frady v. People,* 96 Colo. 43, 40 P.2d 606 and *Andrews v. People,* 33 Colo. 193, 79 Pac. 1031.

In the *Andrews* case, in commenting upon the statute which is the predecessor of the particular statute with which we are here concerned, we said:

". . . . There is no question from the testimony but that the defendants committed the homicide in an attempt to perpetrate the crime of robbery. That fact is undisputed. The element of malice does not enter into the crime of murder committed in such circumstances. The purpose of the statute was to make *every homicide committed in the perpetration or attempt to perpetrate certain felonies* murder, which may be punished by death, if the jury so determine, without regard to malice, deliberation or premeditation. When, therefore, the proof was undisputed that the homicide was committed in an attempt to perpetrate a robbery which the defendants had conspired to commit, *it was not necessary to prove any facts from which malice, deliberation or premeditation could be inferred . . . .*" (Emphasis supplied.)

Whitman's dominant contention in this court is that the death of Hamilton was not committed "in the perpetration of the robbery," because, he says, it was not "in furtherance of the felonious undertaking." In support of this "furtherance of the felony" test, Whitman cites a string of *Pennsylvania* cases of which *Commonwealth v. Redline,* 391 Pa. 486, 137 A.2d 472, is illustrative.

Our attention has not been directed to any Colorado case which specifically considers this "furtherance of the felony" test. Whether this rule would find favor

here is perhaps doubtful in view of our pronouncement in *Robbins v. People,* 142 Colo. 254, 350 P.2d 818.

▪ Be that as it may, in the instant case we need not determine whether this "furtherance of the felony" test has standing in this state; because, assuming for the sake of argument only that such is the rule, Whitman clearly comes *within* the very rule which he urges us to adopt. In other words, as we view it, Hamilton's death was most definitely in furtherance of the robbery and hence was committed in the "perpetration of the robbery."

The "perpetration of a robbery" does not come to an end the split second the victim surrenders his money to the gunman, and most certainly the "robbery" continues where, as in the instant case, the robbers are trying desperately to avoid arrest by police officers who are in extremely hot pursuit. In support of this, see *Bizup v. People,* 150 Colo. 214, 371 P.2d 786, where we stated that a robber's "escape with his ill-gotten goods was as important to the execution of the robbery as gaining possession of the property." Suffice it to say, in this regard, the facts and circumstances of the instant case clearly discloses that this was a murder committed in the perpetration of a robbery.

▪ The foregoing comment in our view adequately disposes of Whitman's contention that it was error for the trial court to refuse to give a tendered instruction defining voluntary and involuntary manslaughter. Similarly, we find no error in instructions numbered thirteen and fourteen, given the jury, which define so-called "felony-murder."

▪ Finally, error is assigned to admission into evidence, over objection, of certain photographs taken at the scene of the fatal accident. These pictures were not even so-called "bloody" pictures, but only depicted the two vehicles in their wrecked condition after the violent collision in which an innocent citizen met his unfortu-

nate and untimely death. We perceive no error in the reception of these photographs.

The judgment is affirmed.