**Alton Carol FRANKS, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F–78–75.**

Court of Criminal Appeals of Oklahoma.

Nov. 4, 1981.

Rehearing Denied Nov. 30, 1981.

Robert A. Ravitz, Asst. Public Defender, Oklahoma County, Oklahoma City, for appellant.

Jan Eric Cartwright, Atty. Gen., Susan Talbot, Asst. Atty. Gen., Oklahoma City, for appellee.

## OPINION

BRETT, Presiding Judge:

The primary issue to be resolved in this case is whether the facts support a convic-tion for Murder in the First Degree under the felony-murder doctrine, statutorily en-acted in Laws 1976, 1st Ex.Sess., ch. 1, § 1, now 21 O.S.Supp.1980, § 701.7(B). The ap-pellant was convicted in Oklahoma County District Court, their case no. CRF–77–3602, of First Degree Murder in January of 1978. A sentence of death was returned by the jury and imposed by the Honorable Harold C. Theus in February of 1978, after a find-ing of the following aggravating circum-stances: that he had been convicted of pre-vious felonies involving the use or threat of violence; that he had created a great risk of death to more than one individual; that the probability exists that he would be a continuing threat to society.

In its disposition of this appeal, this Court has examined numerous assignments of er-ror [1] and determined either that they are without merit or a discussion of them would be superfluous within the confines of this opinion.

On the evening of September 29, 1977, somewhere between 9:15 and 9:25 p. m., the appellant committed an armed robbery at Jim's Supermarket, 4513 South May Ave-nue, in Oklahoma City. At approximately 9:35 p. m. on September 29, Officer James Peck, who was unaware of the robbery, stopped appellant's blue Chevrolet in the vicinity of S.W. 35 and Kentucky after ob-serving him speeding and running stop signs from the first point of observation, in the vicinity of S.W. 40 and Pennsylvania. The appellant rolled out onto the pavement and pointed his pistol at Peck, then got up, approached Peck and stuck his pistol in the officer's chin. Appellant removed Peck's Smith and Wesson .38 from the officer's holster and Officer Peck grabbed the gun barrel and slammed it into the appellant's forehead, although the appellant retained possession of the gun. Then the officer

---

1. Those propositions addressed the following issues: change of venue; expert witnesses; the reading of the name and address of a correc-tions officer as a State's witness; the pre-sen-tence investigation report; the State's inquiry into the facts of a prior conviction during the second stage; imposition of the death penalty; an instruction on robbery as a basis for felony-murder; an instruction on the underlying crime; comments on parole during the second stage; the admission of certain prior judgments and sentences; and prosecutorial comment in the second stage.

pushed the appellant to the ground and ran. While he was running, Officer Peck heard shots from two (2) different guns, and then he saw the appellant get into his Chevrolet, and drive off without the aid of headlights, turning north onto Kentucky. Officer Peck was prevented from pursuit because of failure of his automobile's carburetor. Bullets from a .38 and a .22 were found at the scene of the altercation between the appellant and Officer Peck.

Appellant's third confrontation came somewhere between 9:20 and 9:40 p. m., when he ran a stop sign and crashed with Susan Harris' vehicle at S.W. 23 and Villa. A passenger in the Harris car, the driver's three-month-old daughter, was killed as a result of that collision. Witnesses testified that the appellant's vehicle was speeding with its lights off when it ran the stop sign.

The appellant challenges his conviction under the felony-murder statute in his eighth assignment of error. The charging information recites three (3) underlying bases, as follow: the robbery of Jim's Supermarket, escape from lawful custody, and the robbery of Officer Jim Peck.

▪ First, escape from lawful custody must be examined for its appropriateness as the basis of first degree murder. Under Laws 1976, ch. 175, § 1, now 21 O.S.Supp. 1980, § 443, there are escapes which would support a first degree murder charge. The escapes prohibited under this section, however, refer to escapes from the custody of the Department of Corrections or while awaiting charges or trial. The facts of this case do not support such a felony charge. Rather, these facts support the misdemeanor charge of eluding a peace officer, 21 O.S.1971, § 540A,[2] and, as such, do not provide the proper basis for first degree murder.

▪ In considering the remaining felonies charged, this Court must determine whether there is a causal link by which these crimes were associated with the traffic fatality. No underlying felony can provide the foundation for a charge of felony-

murder unless there is a causal link between the two crimes. *Wade v. State*, 581 P.2d 914 (Okl.Cr.1978); and *Clark v. State*, 558 P.2d 674 (Okl.Cr.1977). In *Wade*, the underlying felony was possession of a firearm in an establishment where liquor is sold, which firearm was also the weapon used by the defendant in shooting the victim in that same liquor establishment. The case of *Clark v. State*, supra, involved an armed robbery of a bank where hostages were taken. Within a few miles and minutes, the perpetrators shot a hostage to avoid detection and implement their escape. In both cases the nexus of the underlying crime to the homicide was clearly established, and the underlying crime was closely related to the homicide.

As this Court said in *Wade v. State*, supra, the application of the felony-murder doctrine:

> . . . is subject to the limitation that there must be a nexus between the underlying felony and the death of the victim. The felony must be inherently or potentially dangerous to human life, inherently dangerous as determined by the elements of the offense or potentially dangerous in light of the facts and circumstances surrounding both the felony and the homicide. *Wade*, supra, at 916.

Looking first to the robbery of Jim's Supermarket, the evidence reveals that the appellant left that scene unpursued, and several minutes and some distance later was stopped by Officer Peck for two traffic offenses, speeding and running stop signs. Not only was there no hot pursuit from the grocery store robbery, neither was Officer Peck aware of that robbery when he stopped the appellant. Before an arrest could be completed, the appellant disarmed Officer Peck, the officer ran, and the appellant drove off, without the use of his headlights, and unpursued by Officer Peck, who had run some distance in his flight from the appellant's shots. The appellant then drove from S.W. 35 and Kentucky to the fatal site at S.W. 23 and Villa.

**2.** This statute was amended by Laws 1980, ch. 115, § 1; see also 21 O.S.Supp.1980, § 540A.

A fatal car accident also led to a first degree murder conviction in *Whitman v. People*, 161 Colo. 110, 420 P.2d 416 (1966), where punishment was set at life imprisonment. In that case, the defendant led the police on a high speed chase from the scene of the robbery. In addressing the continuing nature of the underlying felony, that court said, "[T]he 'perpetration of a robbery' does not come to an end the split second the victim surrenders his money to the gunman, and most certainly the 'robbery' continues where, as in the instant case, the robbers are *trying desperately to avoid arrest by police officers who are in extremely hot pursuit.*" (our emphasis). *Whitman*, supra, 420 P.2d at 419. See also *State v. Beal*, 470 S.W.2d 509 (Missouri 1971), where the chase also began at the scene of the crime.

Obvious distinctions set this case apart from *Whitman*. In *Whitman*, the defendant was pursued from the scene of the robbery. With speeds up to 100 m. p. h., he ran at least six stop signs and several signal-light-controlled intersections during his flight from the police. The chase ended with the fatal accident. In the case before this Court, the appellant was not pursued as he left the grocery store robbery nor was he being chased by a police car at the time of the accident. He was stopped by Officer Peck for an unrelated traffic violation, and he left the scene of his altercation with Officer Peck unpursued. Later he was involved in the fatal accident.

If there was no causal connection joining the armed robbery and the killing of Brandi Michelle Harris, that robbery cannot support a first degree murder conviction in the appeal now before this Court. In *State v. Diebold*, 152 Wash. 68, 277 P. 394 (1929), a conviction for murder in the second degree was reversed. The defendant had taken a car without the consent of the owner, driven it five miles, eaten in a cafe, and was returning the car at the time of the accident. The Washington court held that the underlying crime was complete when the defendant arrived at the restaurant. Also noteworthy in the *Diebold* case is the absence of a hot pursuit.

As indicated in *Diebold*, supra, the homicide which is charged on the basis of an underlying felony must have been committed in the course of the perpetration of that underlying crime. At the time of the killing, the accused must be engaged in some act which is required for the full execution of that underlying crime, and the killing must be the consequence of that crime. If such a legal relationship does not exist between the killing and the crime committed, the underlying offense cannot support the resulting homicide.

In the case now before this Court, there is no nexus which ties either the armed robbery of the grocery store or the robbery of Officer Peck to the death of Brandi Michelle Harris. The question is not whether the defendant was guilty of a crime in causing the death of Brandi Harris but whether the evidence supports a conviction of murder in the first degree and a sentence of death. It does not. The armed robberies were complete. There was no hot pursuit nor a high speed chase of the appellant as he left the scene of either crime. This was not one continuing transaction but was a series of unrelated incidents. It is inconceivable that the Legislature intended that the first degree murder statute should apply to the circumstances of this case.

A number of additional arguments urged by the appellant should be discussed, the first of which is the duplicity of the information, in which three distinct underlying felonies were charged in one count. The appellant's demurrer, motion to quash and set aside the information to the first information, and motion to strike the amended information were all overruled. The State's position, that the appellant's argument is rendered moot by his admission to the charged predicate crimes, is unpersuasive because it circumvents the primary issue, which is whether the commission of any of these predicate crimes was the proximate cause of the homicide.

With certain restrictions, different offenses may be charged in a single infor-

mation under separate counts. *Dodson v. State,* 562 P.2d 916 (Okl.Cr.1977). This Court has said that a defendant is constitutionally entitled to a verdict in which all of the jurors are in agreement upon the same criminal act or transaction. See *Cody v. State,* 361 P.2d 307 (Okl.Cr.1961). The State's failure to allege these acts in separate counts and the trial court's failure to properly instruct the jury regarding its responsibility to determine which act was the predicate felony denied the appellant his due process, as it pertains to the first degree murder charge.

▪ The seventh allegation is that the 8 x 10 photograph of the deceased infant, State's Exhibit No. 15, was introduced into evidence for the sole purpose of arousing prejudice in the minds of the jurors. The defense preserved this alleged error by both a motion in limine and an objection at the time of admission, with exceptions noted. Identification of the deceased was not in issue and neither was "the way she looked," although these State arguments prevailed at the trial. The admission of this photograph was an abuse of discretion in that it provided no proof and was prejudicial. See *Oxendine v. State,* 335 P.2d 940 (Okl.Cr. 1958). This Court cannot conceive of any probative value inherent to this photograph and can only imagine that the State used it to evoke the sympathy of the jury for this beautiful young victim.

▪ Photographs of a homicide victim "are inadmissible unless they are relevant to some material issue and would reasonably assist the jury in the determination of the defendant's guilt, and this relevancy must outweigh the danger that the jury would substitute emotion for reason as a basis of their verdict." *Oxendine,* supra, at 943. The fact that the *Oxendine* photos

were taken subsequent to the victim's death does not preclude the use of that rule regarding a picture of the victim prior to death. The horror of the homicide can be equally evoked with a photo of a victim who is a beautiful baby as it can be with gruesome death pictures. The emotional effect is as potentially damaging.

▪ In his eleventh proposition, the appellant cites numerous arguments made by the prosecutor in his statements to the jury at the close of the first stage. This Court has examined those statements and finds that those comments aimed at the vindication of community outrage were prejudicial and that the objection entered by the appellant should have been sustained. See *Chase v. State,* 541 P.2d 867 (Okl.Cr.1975); and *Potter v. State,* 511 P.2d 1120 (Okl.Cr.1973). "Counsel generally has the right to discuss fully the evidence and arising inferences." *Reeves v. State,* 601 P.2d 113 (Okl.Cr.1979). Counsel exceeded the limitations of that right in this case.

▪ Finally, there is merit to the argument that the verdict forms, submitted over the appellant's objection in the second stage of the trial, resulted in a directed verdict if any aggravating circumstances were found. The aggravating circumstances appeared only on the same verdict form as the sentence of death. But the jury was instructed to check and sign any aggravating circumstances which they found,[3] so that the finding of aggravating circumstances resulted in a signing of the death sentence verdict form. And when the jury found aggravating circumstances, the act of using the death sentence verdict form to indicate their findings could have resulted in a failure to fully consider mitigating circumstances and led to an erroneous recommendation of the death sentence.

**3.** Instruction No. 7 reads as follows:

If you unanimously find that one or more of the statutory aggravating circumstances existed beyond a reasonable doubt, the law requires you shall reduce such findings to writing by stating specifically what aggravating circumstances existed, if any. This statutory finding must be made a part of your verdict if you impose the death penalty.

You should indicate this finding by checking the box next to such statutory aggravating circumstance on the appropriate verdict form furnished you and such verdict form should be signed by your foreman.

The law does not require you to reduce to writing the mitigating circumstance, if any, you find.

It is the State's contention that the jury was instructed on the appropriate use of the verdict forms and on the weighing of aggravating and mitigating factors.[4] The State then argues that the situation in this case conforms to that of *Jurek v. Texas*, 428 U.S. 262, 49 L.Ed.2d 929, 96 S.Ct. 2950 (1976). However, the statutory scheme in Texas distinguishes that case. In *Jurek*, the answers to certain aggravating factors would yield a sentence of death, while in Oklahoma, aggravation and mitigation are weighed against each other. The resulting prejudice, of including a sentence of death on the same form as the aggravating circumstances, is apparent.

▇▇▇ The evidence supports the guilt of the appellant of the crime of murder in the second degree under the following definition: "When perpetrated by an act imminently dangerous to another person and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual." Laws 1976, 1st Ex.Sess., ch. 1, § 2, now 21 O.S.Supp.1980, § 701.8. Therefore, this conviction is modified from Murder in the First Degree to Murder in the Second Degree and the sentence is reduced from death to life imprisonment. As modified, the judgment and sentence is AFFIRMED.

BUSSEY, J., concurs in results.

CORNISH, J., specially concurs.

CORNISH, Judge, specially concurs:

A homicide which occurs during the commission of a felony enumerated in 21 O.S. Supp.1980, § 701.7(B), is classified as first degree murder. To warrant a verdict of first degree murder, the trier of fact must find there was no break in the chain of events between the initial crime and the homicide. See, *Clark v. State*, 558 P.2d 674 (Okl.Cr.1977).

The trial court instructed that there were three possible predicate felonies for application of the felony-murder rule. The court told the jury that if it found the defendant had caused the victim's death while in the commission of any or all of the three recited felonies, it should find him guilty of murder in the first degree.

The correctness of the instructions for each of the underlying felonies was therefore crucial. In its instructions, the trial court included escape from lawful custody as a possible predicate for felony-murder. Yet that instruction misstated the law on escape. As Judge Brett discusses in his opinion, the escape statutes refer to escapes from confinement or from the custody of

---

4. A reading of these instructions reveals that they do not overcome the prejudice created by the improper verdict form.

No. 5
You are instructed that in the event you unanimously find that one or more of these aggravating circumstances existed beyond a reasonable doubt, then you would be authorized to consider imposing a sentence of death.
If you do not unanimously find beyond a reasonable doubt one or more of the statutory aggravating circumstances existed, then you would not be authorized to consider the penalty of death. In that event the sentence would be imprisonment for life.
If you do unanimously find one or more of these aggravating circumstances existed beyond a reasonable doubt and you further find that such aggravating circumstance or circumstances is outweighed by the finding of one or more mitigating circumstances, the death penalty shall not be imposed. In that event the sentence would be imprisonment for life.

No. 10
To make it perfectly clear so that you may understand, you are instructed as follows:
If you find from the evidence beyond a reasonable doubt that one or more of the alleged aggravating circumstances is true, then you may consider the imposition of the death penalty.
If you should fail to find, or entertain a reasonable doubt thereof, that one or more of the aggravating circumstances are true, then you would not be authorized to impose the death penalty and should return a verdict of life imprisonment. If you find that there are mitigating circumstances which outweigh any aggravating circumstances that you may have found to be true, then you should return a verdict of life imprisonment.
If you should find one or more of the aggravating circumstances to be true so that you may consider the imposition of the death penalty you are the sole and only judge of whether or not those aggravating circumstances are sufficient to warrant the death penalty, whether or not you find mitigating circumstances.

the Department of Corrections. The trial court, however, defined escape in terms of fleeing from arrest. The facts do not support a finding of escape, but rather the misdemeanor of eluding a police officer. See, *Grimes v. State*, 499 P.2d 942 (Okl.Cr. 1972).

This Court can in no way determine which of the crimes the jury found as the basis for felony murder.[1] It is entirely possible that the jury found the armed robbery at the grocery store and the homicide represented one continuous transaction. It is equally possible, however, that the jury found the predicate crime was flight from the incident with the police officer. If that were the case, then the verdict of first degree murder would be based on erroneous instructions and not supported by the facts.

It is conceded that the protraction of events over time and distance accentuate the problem of determining whether the facts warranted application of the felony-murder rule. It is a legitimate assumption, however, that one who plans a robbery and carries it out has also planned to escape from the scene of the crime. His flight is an integral part of the crime. This writer therefore does not agree that the armed robberies had been completed before the homicide occurred.

Since asportation is an element of robbery, the felony is still in progress while the defendant is fleeing from the scene with the stolen property. *Carter v. United States*, 223 F.2d 332, *cert. den.* 350 U.S. 949, 76 S.Ct. 324, 100 L.Ed. 827 (1955); *Jordan v. United States*, 350 A.2d 735 (C.A.D.C.1975). However, mere coincidence in time between the murder and the robbery is insufficient to support a felony-murder conviction. *United States v. Bolden*, 514 F.2d 1301 (D.C. Cir.1975). Disunity in time, place, and purpose between the commission of a robbery and the later homicide may make the two felonies distinct. *Commonwealth v. Kelly*, 337 Pa. 171, 10 A.2d 431 (1940).

Robbery, however, is not confined to a fixed *locus*, but is frequently spread over considerable distance and varying periods of time. *People v. Salas*, 7 Cal.3d 812, 500 P.2d 7, 103 Cal.Rptr. 431 (1972). The fact that the killing does not take place on the premises of the original crime may be important in determining whether there was an appreciable interval between the alleged termination of the robbery and the homicide. It is not, however, decisive of that issue. *Commonwealth v. Dellelo*, 347 Mass. 427, 209 N.E.2d 303 (1965). Nor does lapse of time necessarily terminate the perpetration of a robbery. *State v. Beal*, 470 S.W.2d 509 (Mo.1971).

It is not until the defendant reduces the property to his unmolested dominion and control that the asportation ends and the robbery is terminated. *People v. Kendrick*, 56 Cal.2d 71, 363 P.2d 13, 14 Cal.Rptr. 13, (1961); *State v. Beal*, supra. Termination of the crime depends largely on whether the robber has reached what he regards as a place of temporary safety. See, *State v. Squire*, 292 N.C. 494, 234 S.E.2d 563 (1977).

In *People v. Kendrick*, supra, 363 P.2d 13, the killing occurred about 48 minutes after the robbery. The police officer, who was fatally shot by the defendant, had apparently stopped him for a traffic violation and had no information about the robbery. The homicide was committed while the defendant was in hot flight with the stolen property and in the belief that the officer was about to arrest him for the robbery. There, the California court held the killing fell within the felony-murder rule.

In the present case, had the jury received proper instructions, this writer would have relied on the above analysis. The events were so closely connected so as to be inseparable in terms of time, place, and causal relationship, forming one continuous trans-

---

1. The information charged the following offenses which were construed as possible predicates for felony-murder:

   "While fleeing from the scene of said robbery of Jim Peck [Oklahoma City Police Department Officer] and while fleeing from the rob-

   bery of Jim L. Price and Little Jim's Supermarket and while escaping from lawful custody and while still in the commission of said robberies, defendant did cause the death of Brandi Michelle Harris. . . . "

action. However, because of the incorrect instructions and the other trial errors discussed in the opinion, the conviction of murder in the first degree is not sustainable. The evidence, however, supports murder in the second degree under 21 O.S.Supp.1980, § 701.8(1). The appellant's sentence therefore should be commuted to life imprisonment.