**Michael Allen NOLTE, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

No. F–88–504.

Court of Criminal Appeals of Oklahoma.

Dec. 27, 1994.

As Corrected Jan. 6 and 30, 1995.

Rehearing Denied April 26, 1995.

Larry Johnson, Carnegie, Richard Williams, Anadarko, for appellant at trial.

Melvin Singleterry, Dist. Atty., Scott Julian, Asst. Dist. Atty., Anadarko, for State at trial.

Kevin H. Pate, Asst. Public Defender, Anne M. Moore, Appellate Indigent Defender, Norman, for appellant on appeal.

Susan B. Loving, Atty. Gen., Wellon B. Poe, Asst. Atty. Gen., Oklahoma City, for State on appeal.

## OPINION

JOHNSON, Vice Presiding Judge:

Michael Allen Nolte, Appellant, was tried by jury and convicted of First Degree Murder in violation of 21 O.S.1981, § 701.7B (Felony Murder), in Case No. CRF-87-131 in the District Court of Caddo County before the Honorable David E. Powell, Associate District Judge. The State alleged in its Bill of Particulars, three aggravating circumstances: 1) that the murder of Edgar Wayne Allen was especially heinous, atrocious and cruel; 2) that the murder was committed for the purpose of avoiding or preventing a lawful arrest of prosecution; and 3) that the defendant constituted a continuing threat to society. The jury found the existence of all three aggravating circumstances and recommended a sentence of death. The trial court sentenced Appellant in accordance with the jury's recommendation. On March 14, 1989, Appellant filed an application for a writ of habeas corpus, which this Court subsequently denied in Case No. H-89-192. Appellant has perfected this direct appeal. On February 22, 1993, this Court remanded this case to the District Court of Caddo County for an evidentiary hearing to determine the racial neutral reasons for the exclusion of four minority prospective jurors. On March 24, 1993, we received a transcript of that hearing and the trial court's findings of fact and conclusion of law. Oral argument was held on August 24, 1993.

## FACTS

On the evening of March 18, 1987, Appellant, along with Randall Kawakami, Jeff Huskisson and Steve Scuggs, escaped from a county jail in Pekin, Illinois. The men stole a brown pickup truck and with Huskisson driving, headed toward St. Louis, Missouri. After travelling for some time, it was decided to steal another car. After several failed attempts, it was decided to steal a motorhome. The men reached St. Claire, Missouri, in the early hours of March 19, 1987. From this point on there is conflicting evidence about each participant's involvement in the abduction and killing of Edgar Wayne Allen and the stealing of his motorhome.

Both Huskisson and Scuggs testified at trial that they separated from Appellant and Kawakami in St. Claire and hitchhiked to Lebanon, Missouri, where they stole a red Camero and ended up in an area between Tucumcari and Santa Rosa, New Mexico. There they were arrested on the afternoon of March 20, 1987, after a high speed chase from the police. They denied any involvement in the Allen murder. Neither was charged for Allen's death.

Mr. Kawakami and Appellant were charged with Allen's death. However, charges against Kawakami were dropped because of a violation of the Intrastate Agreement on Detainers. Neither Appellant nor Kawakami testified during the guilt stage of Appellant's trial. However, Appellant's two statements to the authorities were admitted at trial. Appellant is challenging both statements in this appeal as being obtained in violation of his right to counsel during questioning. The following scenario is from those statements.

At a rest area near Rolla, Missouri, Huskisson and Kawakami surprised and attacked Allen at the door of his motorhome. Appellant was standing near the brown truck when this occurred. At Huskisson's direction, Appellant gave him a rope from the back of the truck and returned to the truck. He saw Huskisson and Kawakami drag Allen and the rope into the motorhome and saw the motorhome rocking for a moment. Huskisson and Kawakami left the rest area in the motorhome. Appellant drove the brown truck.

Scuggs drove a blue chevrolet which was stolen along the way to Rolla.

A short distance down Interstate–44, they all stopped. Scuggs discarded his vehicle. The brown truck was turned over to Kawakami. Huskisson and Scuggs, with Appellant driving, rode in the motorhome. Prior to the four arriving in Tulsa, the brown truck was given to a hitchhiker who was picked up by Kawakami. The hitchhiker testified that he and Kawakami drove to Joplin, Missouri, where he took possession of the truck. He saw Appellant in the motorhome, but did not notice if anyone else was inside. He was later arrested on March 20, 1987, after stealing gasoline. It was he who informed the police of the circumstances under which he acquired the truck. (Information was broadcast about the escapees and the motorhome.)

The men separated in Tulsa, leaving Appellant and Kawakami in possession of the motorhome. Appellant said he did not know whether Mr. Allen was dead or alive, but related that Kawakami told him Mr. Allen was still alive. They drove through Oklahoma City searching for a place to leave Mr. Allen's body. After nightfall, they came upon Bethel Road in Caddo County, Oklahoma, where the body was dumped.

Appellant and Kawakami continued their travel until they reached Tucumcari, New Mexico, where they were arrested at the Holiday Inn, early on the morning of March 21, 1987.

Appellant has presented twenty (20) propositions of error. Several propositions have overlapping issues and will be considered together.

## I. *JURISDICTION*

■ The issue of jurisdiction was raised in this case in Appellant's Petition For Writ of Habeas Corpus, Case No. H–89–192 filed on March 14, 1989. On July 13, 1989, this Court issued its Order denying the Writ, holding:

> When an offense is commenced outside of Oklahoma but is consummated within the boundaries of Oklahoma, jurisdiction lies within the county in which the offense is consummated. 22 O.S.1981, § 121. If there is competent evidence that the offense was consummated in Oklahoma, we will not grant the writ of habeas corpus. *See Howe v. State*, 669 P.2d 780 (Okl.Cr. 1983). Because our review of the record reveals competent evidence that the act of murder was consummated in Caddo County, Oklahoma, we do not find that Petitioner's application for writ of habeas corpus should be granted.

Appellant recognizes the principle of res judicata, but argues that because the evidence was based on inaccurate and incomplete arguments and a review that included reliance on constitutionally inadmissible evidence (Appellant's statement in Exhibit 73 that the victim was still living when he was abandoned in Missouri was disproved by other evidence including the fact the body was found in Caddo County, Oklahoma, however, the medical evidence was inconclusive), this Court must revisit the jurisdiction issue. He urges this Court to do so. Based on our review of the record and our holding regarding the admissibility of Exhibit 73, we find there was sufficient evidence to find that the act of murder was consummated in Caddo, Oklahoma, and therefore, jurisdiction is in Oklahoma.

## II. *JURY SELECTION ISSUES*

■ In his first assignment of error, Appellant claims that the State's exclusion of minorities from the jury violated his constitutional and statutory rights. Specifically, he claims that the State used four of its peremptory challenges to exclude all four minority members of the community who were called to his jury panel without the requisite showing of race neutral reasons. Three of the prospective jurors were Native American and one was Black.[1] After each peremptory challenge, Appellant objected and argued the rule set forth in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The State argued that *Batson* was inapplicable because Appellant was not a minority and

1. In his "Supplemental Brief of Appellant After Remanded Evidentiary Hearing On Jury Selection" filed herein on July 6, 1993, Appellant withdrew his challenge to Black juror, Emery V. Johnson. See footnote 3 in said Brief.

therefore had no standing to raise the issue. The trial court agreed and overruled Appellant's objections.

We note that subsequent to the trial in this case, the Supreme Court, in *Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), extended *Batson* to allow a criminal defendant to "object to race-based exclusions of jurors effected through peremptory challenges whether or not the defendant and the excluded juror share the same race." *Id.*, 499 U.S. at 401, 111 S.Ct. at 1366. (Emphasis added). Thus, under *Powers*, the trial court should have required the State to articulate a race-neutral reason for exercising the peremptory challenges in question. See *Green v. State*, 862 P.2d 1271, 1272 (Okl.Cr. 1993).

The State concedes that the prosecutor offered no grounds for the removal of these prospective jurors. However, the State conjectures that the three prospective Native American jurors, Scott, Akeen, and Wetselline, "appeared to be disinterested" and "when questioned on whether they would follow the law, all answered they would, but in a less than enthusiastic manner." As to the prospective black juror, the State asserts that the voir dire revealed that he had missed the preceding day's activities due to health problems. This Court could find no basis in the record for the State's claims. In fact, the record reveals that the prospective black juror, Mr. Emory Johnson was the fourth of the initial twelve prospective jurors seated on the panel on the first day of voir dire. Further, the record reveals that it was prospective juror, Mr. Weselline, who was absent on the first day of voir dire.

On February 22, 1993, this Court issued its Order remanding this cause for a hearing on the issue of jury selection. On March 15, 1993, the trial court held the hearing and on March 24, 1993, issued its findings of fact and conclusions of law. However, Appellant complains that the trial court merely adopted the State's proposed findings and conclusions which were based upon the prosecutor's responses to its leading questions containing speculative reasons. Additionally, Appellant asserts that based on the prosecutor's testimony that he had no independent present recollection of the voir dire, the State did not meet its burden of proof to establish race-neutral reasons for excusing the prospective jurors in question. Appellant cites *Harrison v. Ryan*, 909 F.2d 84, 87 (3rd Cir.1990), (quoting *Batson*, 476 U.S. at 98, 106 S.Ct. at 1724), where the court held that a prosecutor's failure to recall his reason for using a peremptory challenge to strike a minority venireperson is insufficient to satisfy the *Batson* requirement that the prosecutor must articulate a neutral explanation related to the particular case to be tried.

▆ Appellant also argues that the trial court may not simply accept the prosecutor's explanations at face value if other evidence undermines the credibility of the explanations or, "as here, the 'after-the-fact speculations.'" Appellant cites *State v. Collier*, 553 So.2d 815, 821 (La.1989). We have reviewed the transcript of the mandated hearing and the trial court's findings and conclusions. After due consideration, we find that the State met its burden of proof in establishing race-neutral reasons for excusing the prospective jurors in question, as follows:

1. Juror Scott was excused because of the close proximity of her son's age and the defendant.

2. Juror Akeen was excused because he indicated a member of his family had contact with the Office of the District Attorney and the Caddo County Sheriff's Office within the past two or three years.

3. Juror Wetselline indicated he had been excused from jury duty the day before due to health problems.

▆ In his seventh proposition of error, Appellant submits that his jury was selected pursuant to a scheme where certain cognizable classes of citizens were not part of the jury pool, in violation of the state and federal constitutions. He reasons that because jurors are selected from persons over eighteen years of age who hold current driver's licenses and reside in the county where the trial is to be held, there is a systematic exclusion of potential jurors who are unable (i.e., indigent, handicapped, etc.) or unwilling (i.e., religious beliefs) to obtain driver's licenses. Additionally, he claims it excludes out-of-state stu-

dents and certain military personnel. However, Appellant offers no authority recognizing these particular groups as "cognizable." He is asking this Court to recognize them as such. Appellant has not demonstrated that representation of this group in venires is not fair and reasonable in relation to the number of such people in the community. We are not persuaded to by Appellant's position.

Appellant also challenges the statute which allows persons over the age of seventy (70) to decline to serve. We have previously addressed the issue of persons over the age of seventy (70) in *Fox v. State*, 779 P.2d 562, 567 (Okl.Cr.1989) and are unpersuaded to change our holding.

## III. *GUILT–INNOCENCE ISSUES*

In his second assignment of error, Appellant asserts that the trial court erred in denying his motion to suppress the two statements allegedly taken in violation of *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Appellant asserts that the first of the two statements was made on March 30, 1987, to Detective Sergeant Patrick Landrith of Tazewell County, Illinois, and Detective Ray Montano of the Quay County Sheriff's Department in Tucumcari, New Mexico, who admitted that they reinitiated contact after Appellant had been provided counsel on that same day. Both detectives testified that they initiated contact with Appellant only to discuss waiver of his extradition to Illinois. Appellant expressed that he did not want to discuss extradition with them until he consulted his attorney. Presumably, Appellant later talked to his attorney. When the officers returned, Appellant told them his attorney advised him not to talk to them, but "he wanted to clear everything up." As a result of this contact, State Exhibits 28, 73 and 74 were obtained. State's exhibit 28 is Appellant's signed waiver of rights form. State's Exhibit 73 is Appellant's taped statement and 74 is an atlas utilized during the course of the statement.

Thereafter, there were several other state-initiated contacts with Appellant. On or about March 31, 1987, Appellant was taken to Missouri for questioning by the Illinois authorities. He was returned to Tucumcari the next day. On April 6, 1987, the victim's widow, Etta Allen, contacted Officer Montano and inquired whether he would see if Appellant would talk to her for the purpose of locating her husband's body so that he may receive a decent burial. Detective Montano contacted Deputy Sheriff Ray Knight to make the inquiry of Appellant. Both Detective Montano and Deputy Knight talked to Appellant. They testified that Appellant told them that his lawyer advised him not to talk to Mrs. Allen, but that he would talk to her anyway. On April 12, 1987, arrangements were made by the authorities for a meeting between Appellant and Mrs. Allen. It was from this contact that Appellant made a drawing identifying the location of the body.

The circumstances surrounding the securing of the second statement began with Appellant being taken to Oklahoma by Detective Montano and Deputy Knight. The trip occurred on April 14, 1987, when the three met with Oklahoma criminal investigator Lewis Hawkins. Appellant led them to the body which was found in Caddo County, Oklahoma. Since he was not available when the body was found, OSBI Agent Mark McCoy, travelled to Tucumcari on April 15, 1987. Agent McCoy testified that prior to talking to Appellant, he was present when Appellant's attorney said that Appellant wanted to talk to them. Appellant's statement was taken within ten to fifteen minutes after this. There was no testimony as to the reason why Appellant's attorney was not present when Appellant made his second taped statement (Exhibit # 35).

Both parties rely on *Minnick v. Mississippi*, 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990). The Supreme Court in *Minnick* extended the *Edwards'* rule by holding "that when counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney." 498 U.S. at 153, 111 S.Ct. at 491. The Supreme Court reasoned that a single consultation with an attorney does not remove the suspect from persistent attempts by officials to persuade him to waive his rights, or from the coercive pressures that

accompany custody, especially prolonged custody. The Court refused to adopt a regime in which the *Edwards'* protection could pass in and out of existence multiple times prior to arraignment. In establishing the bright-line rule in *Minnick,* the Court took in consideration the fact that consultation is not a precise concept, and "even with necessary scope of consultation settled, the officials in charge of the case would have to confirm the occurrence and, possibly, the extent of consultation to determine whether further interrogation is permissible. The necessary inquiries could interfere with the attorney-client privilege." 498 U.S. at 154, 111 S.Ct. at 492.

▮ There is no dispute that the authorities in this case reinitiated contact with Appellant. However, the contact was for the purpose of discussing waiver of extradition to Illinois. It was Appellant who initiated the conversation or discussion about the crime involved herein. In *Minnick,* the Supreme Court pointed out, "*Edwards* does not foreclose finding a waiver of Fifth Amendment protection after counsel has been **requested, provided the accused has initiated the conversation or discussions** with the authorities; but that is not the case before us." 498 U.S. at 154, 111 S.Ct. at 492. (Emphasis added). We hold Appellant's first statement was admissible at trial.

▮ We must now determine whether Appellant's second statement (Exhibit 35) is valid. OSBI Agent Mark McCoy testified that he was present when Appellant's attorney stated that Appellant wanted to talk (Appellant asserts that this is inadmissible hearsay). Approximately ten to fifteen minutes later, McCoy took the second statement, after reading Appellant the Oklahoma waiver rights. There was no testimony as to why Appellant's attorney did not stay for the taking of this statement. In any event, we find this statement to be valid and thus admissible at trial.

▮ In his fourth assignment of error, Appellant contends that reversible error occurred when the trial court allowed the victim's driver license with his photograph to be admitted into evidence. Appellant argues that since the victim's identification was not

an issue, said photograph was not relevant to any issue and had no inherent probative value, but served only to invoke the sympathy of the jury, which was highly prejudicial to Appellant.

This Court does not condone the use of "before" photographs in homicide cases. See *Newbury v. State,* 695 P.2d 531, 535 (Okl.Cr. 1985). However, we are of the opinion that any error in admitting the driver license's photograph was harmless beyond a reasonable doubt under the circumstances of this case.

▮ In his fifth assignment of error, Appellant complains of "pervasive" prosecutorial misconduct which denied him a fair trial. Specifically, he calls the Court's attention to the following:

1. The Prosecutor repeatedly asserted in closing argument that the charge of murder was factually established and that each element of the charge was uncontroverted.

2. The Prosecutor in closing argument misrepresented the evidence; gave personal opinions as to the veracity of the witnesses by insisting that "absolutely" no evidence had been presented from the witness stand or anywhere else" to refute their claim that they were not connected to the homicide; misstated the law by telling the jury that the only evidence presented from the witness stand "is that it was [Mr. Nolte]. That's all you have to consider. That's all."; and went outside the record when he told the jury that contrary to Appellant's statement, there was no one working as mower on a frosty morning in March of 1987.

3. The Prosecutor repeatedly engaged in name calling by characterizing Appellant as a "con man," "deceptive," a "deceiver," a liar who couldn't resist "embellishing the lie" and a "murderer."

4. The Prosecutor urged the jury to convict with a cry for justice, by telling them "... if you don't find this defendant guilty justice won't be done in this case in Caddo County."

5. The Prosecutor disparaged defense counsel when he characterized the defense strategy as a "fox hunt."

We have considered each of the comments and the cases cited by Appellant. Appellant failed to object to many of the challenged comments. This failure to object waives any error on appeal, except those constituting fundamental or plain error. *VanWoundenberg v. State,* 720 P.2d 328 (Okl.Cr.1986). While we do not condone the arguments of the prosecutor, in light of the totality of the evidence presented at trial, we do not find the statements to be so egregious as to require reversal. See *Brewer v. State,* 718 P.2d 354 (Okl.Cr.1986).

In his sixth assignment of error, Appellant contends that the trial court committed prejudicial error in delivering an instruction concerning flight. He argues that the instruction violated his constitutional due process right to have the instructions reasonably relate to the evidence. This Court addressed the propriety of flight instructions in *Mitchell v. State,* 876 P.2d 682 (Okla.Crim.App. 1994), rehearing denied July 27, 1994. In *Mitchell,* we upheld the giving of flight instructions where a defendant's statements concerning departure are made in a voluntary confession. We find no error in this case. Finding no error that requires reversal as to guilt, the jury's verdict as to guilt is affirmed.

## IV. *PUNISHMENT ISSUES*

Appellant presents thirteen assignments of error affecting the punishment stage of trial. However, we have determined that resentencing is appropriate and will address those assignments affecting resentencing.

■ In his ninth assignment of error, Appellant urges this Court to vacate his death sentence due to the submission of a prejudicial verdict form. The trial court issued a total of 10 instructions and 3 verdict forms in the second stage. The verdict

forms for the second stage of death penalty proceedings are:

(1) OUJI–CR 443/OUJI–CR 444—Verdict Form For Aggravating Circumstances/Death Verdict Form

(2) OUJI–CR 445—Life Imprisonment Verdict Form

(3) Life Imprisonment Without Parole

In this case, the trial court combined Forms 443 and 444. Appellant argues that the combining of these forms, in conjunction with Instructions Nos. 8 & 9, left no alternative but to issue the death penalty since this was the only form on which it could indicate its finding of aggravating circumstances. This Court addressed this issue in *Franks v. State,* 636 P.2d 361, 366 (Okl.Cr.1981), where we noted:

And when the jury found aggravating circumstances, the act of using the death sentence verdict form to indicate their findings could have resulted in a failure to fully consider mitigating circumstances and led to the erroneous recommendation of the death sentence. *Id.,* at page 366.

As in *Franks,* the jury was instructed to check and sign any aggravating circumstances which they found.[2] As such, the finding of any aggravating circumstances resulted in a signing of the death sentence verdict form.

The State contends that the recent case of *Thomas v. State,* 811 P.2d 1337, 1338 (Okl.Cr. 1991) distinguishes *Franks* and should apply. We do not agree that *Thomas* is analogous to this case. Unlike *Franks,* the *Thomas* jury was not required by the instructions to indicate the finding of the one aggravating circumstance unless it recommended the death sentence. We find merit in this assignment of error.

■ In his tenth and eleventh assignments of error, Appellant challenges his death sentence because the trial court re-

---

2. Instruction No. 8 reads as follows:
   If you unanimously find that one or more of the aggravating circumstances existed beyond a reasonable doubt, the law requires that you reduce such findings to writing by stating specifically what aggravating circumstances existed, if any. This finding must be made a part of your verdict.

   You must indicate this finding by checking the box next to such aggravating circumstances on the appropriate verdict form furnished you, and such verdict form must be signed by your foreman.
   The law does not require you to reduce to writing the mitigating circumstances you find, if any.

fused to give the mandatory and otherwise complete instructions on mitigating evidence, thus precluding the jury from considering and giving effect to such evidence. The only instruction pertaining to mitigation is No. 7.[3] This instruction does not define "mitigating circumstances" as set forth in the OUJI–438[4], which Appellant requested to be given but was rejected by the trial court.

Additionally, the trial court failed to give Appellant's requested Instruction OUJI–CR 439, which provides the means whereby, as entitled, "circumstances which may be mitigating" can be listed. Appellant also requested OUJI–CR 440[5] which was rejected by the trial court.

It is the State's contention that the jury was sufficiently instructed to weigh mitigating circumstances against aggravating circumstances and that the aggravating circumstances had to outweigh the mitigating circumstances in order to consider the death penalty. As pointed out earlier, the only instruction pertaining to mitigation is Instruction No. 7. The trial court, having rejected OUJI–CR 438, 439 & 440, failed to give any instruction concerning the mandatory balancing function under 21 O.S.1981, 701.11, which both requires a jury to weigh aggravating circumstances against mitigating circumstances and prohibits a death verdict where it determines the aggravating circumstance(s) is outweighed by the finding of one or more mitigating circumstances. The trial court erred in rejecting the three requested instructions. Thus, we find that the jury's discretion was neither guided nor channeled in its consideration of mitigating circumstances.

Based on the foregoing, Appellant's sentence of death is **REVERSED** and this case is **REMANDED** to the District Court for **RESENTENCING.** The judgment of guilt is **AFFIRMED.**

LUMPKIN, P.J., and LANE, CHAPEL and STRUBHAR, JJ., concur.

---

3.  Instruction No. 7 reads as follows:

> You are instructed that mitigating circumstances are not specifically enumerated in the Statutes of this State, but the law of this State sets up certain minimum mitigating circumstances you shall follow as guidelines in determining which sentence you impose in this case. You shall consider any or all of these minimum mitigating circumstances which you find apply to the facts and circumstances of this case. You are not limited in your consideration to these minimum mitigating circumstances. You may consider any additional mitigating circumstances, if any, you find from the evidence in this case. What are and are not additional mitigating circumstances is for you the jury, to determine.
> The following are some of the minimum mitigating circumstances as provided by law:
> 1. The defendant was an accomplice in a murder committed by another and extent of his participation in the homicidal act.
> 2. At the time of the murder, the capacity of the defendant to appreciate the criminality (wrongfulness) of his conduct or to conform his conduct to the requirements of law was impaired as a result of intoxication.

4.  OUJI–CR 438 reads as follows:
> Mitigating circumstances are those which, in fairness and mercy, may be considered as extenuating or reducing the degree of moral culpability or blame. The determination of what are mitigating circumstances is for you as jurors to resolve under the facts and circumstances of this case.

5.  OUJI–CR 440 reads as follows:
> If you unanimously find that one or more of the aggravating circumstances existed beyond a reasonable doubt, unless you also unanimously find that such aggravating circumstance or circumstances outweigh the finding of one or more mitigating circumstances, the death penalty shall not be imposed.